# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS TIBBLE, Bankruptcy Trustee for the
BANKRUPTCY ESTATE OF ROBERT
PRODINGER, D.O., and STEPHEN L.
LANGELAND, Bankruptcy Trustee for the
BANKRUPTCY ESTATE OF BATTLE CREEK
EMERGENCY PHYSICIANS, P.C.,

UNPUBLISHED
October 28, 2014

       Plaintiffs-Appellees/Cross-
       Appellants,

and

DALE RUSSELL, P.A.,

       Plaintiff,

v

No. 306964
Calhoun Circuit Court
LC No. 2006-001805-CZ

AMERICAN PHYSICIANS CAPITAL, INC.,

       Defendant-Appellant/Cross-
       Appellee.

Before: WILDER, P.J., and FITZGERALD and MARKEY, JJ.

PER CURIAM.

Robert Prodinger, D.O., and Battle Creek Emergency Physicians, P.C. (BCEP), sued defendant American Physicians Capital, Inc. (AP Capital), their medical malpractice insurer, for bad faith in failing to settle a wrongful death action brought against them by the Estate of Daniel A. Symons (the Symons Estate). In a separate action, Prodinger and BCEP sued attorney Randy Hackney for legal malpractice in the wrongful death action. During the course of the proceedings, Prodinger and BCEP filed for bankruptcy. The trustees of the bankruptcy estates were substituted as plaintiffs. Following a jury trial, a jury found that AP Capital had acted in bad faith. It awarded $204,000 to Thomas Tibble, trustee of the bankruptcy estate of Prodinger, and $1,497,723 to Steven Langeland, trustee of the bankruptcy estate of BCEP. The trial court

-1-

set off the damages awarded to Langeland by $350,000, the amount of the settlement in the legal malpractice action. On October 17, 2011, judgment was entered against AP Capital in favor of Tibble in the amount of $332,671.72 and Langeland in the amount of $1,489,741.91.[1] AP Capital appeals as of right, and Tibble and Langeland cross-appeal. We affirm in part, reverse in part, vacate in part, and remand.

## I. THE SYMONS JUDGMENT

Prodinger is an emergency room physician. In 2003, Prodinger was a member of BCEP. BCEP had a contract with Battle Creek Health Systems (BCHS) to staff the hospital's emergency room department. BCEP hired physician's assistants to work with the emergency room physicians at BCHS. BCEP had a malpractice insurance policy with AP Capital. The policy had a coverage limit of $300,000 for a single incident of medical malpractice. The policy provided AP Capital with the right to settle lawsuits without the consent of BCEP.

On May 2, 2003, Daniel Symons, a 35-year-old employed husband and father of three young children, appeared at the BCHS emergency room and was seen by plaintiff Dale Russell, a physician's assistant. Prodinger, the emergency room physician that was supervising Russell, never spoke with Symons. Russell discharged Symons. Hours later, Symons had a heart attack. He was again brought to the emergency room, but was dead on arrival.

The Symons Estate sued BCEP, Prodinger, and Russell, as well as BCHS. AP Capital assigned Hackney, an experienced attorney who specialized in medical malpractice, to defend BCEP, Prodinger, and Russell. The wrongful death action went to trial, and the jury rendered a verdict of $1.3[2] million in favor of the Symons Estate and against BCEP, Prodinger, and Russell. AP Capital initially indicated that it would appeal the verdict after Hackney provided it with several grounds for an appeal, but ultimately chose not to appeal after an appellate attorney reviewed the transcript of the trial and gave AP Capital a low chance of winning on appeal. AP Capital paid the policy limit of $300,000, plus costs and interest, for a total of $371,000 to the Symons Estate. BCEP and Prodinger retained their own attorney and appealed.

## II. APPEAL OF THE SYMONS JUDGMENT; PRETRIAL PROCEEDINGS

In May 2006, while the appeal of the Symons judgment was pending, Prodinger and BCEP[3] sued AP Capital for bad faith in failing to settle with the Symons Estate. Prodinger and BCEP requested judgment against AP Capital "in an amount equal to the excess judgment entered against [them], plus interest, costs and attorney fees so wrongfully incurred." Prodinger and BCEP also sued Hackney and his law firm[4] for legal malpractice, claiming in relevant part that Hackney committed malpractice when he failed to object to an instruction regarding the

---

[1] These amounts are inclusive of damages, costs, attorney fees, and judgment interest.

[2] The verdict was actually for $1,307,486.

[3] Russell joined Prodinger and BCEP as a plaintiff, but voluntarily dismissed his claim.

[4] Hackney, Groover, Hoover & Bean, collectively referred to as the Hackney defendants.

vicarious liability of Prodinger and when he failed to request a setoff for the Social Security benefits that the Symons children would receive. Prodinger and BCEP claimed that the malpractice caused injuries and damages, which included "[e]xposure to, and the likelihood of being required to pay, medical malpractice damages in excess of the available policy limits" and "[e]expenses associated with post-judgment attorney fees, accounting fee, debt reporting fees, damage to professional reputation; inclusion in the National Data Bank." They requested a judgment that would fully compensate them for their losses. The trial court stayed the two actions for the pendency of the appeal of the Symons judgment.[5] Neither Prodinger nor BCEP obtained relief from the Symons judgment on appeal.[6]

The trial court lifted the stay of the bad faith and legal malpractice actions in November 2009 and consolidated the two actions for discovery and trial. The parties reached a settlement with the Hackney defendants in the amount of $350,000 in the legal malpractice action prior to trial.[7]

### III. TRIAL ON THE BAD FAITH ACTION

---

[5] On June 7, 2007, BCEP filed for Chapter 7 bankruptcy in an effort to be relieved of the Symons judgment. Langeland, the trustee of the bankruptcy estate, was substituted for BCEP as plaintiff in the two actions. BCEP stopped doing business the day it filed for bankruptcy and, the following day, all of its employees became 90-day employees of BCHS. On May 10, 2010, Prodinger filed for Chapter 7 bankruptcy protection in an effort to be relieved of the Symons judgment. Tibble, the trustee of the bankruptcy estate, was substituted for Prodinger as plaintiff in the two actions.

[6] *Symons v Prodinger*, 484 Mich 851; 768 NW2d 317 (2009). The Supreme Court reversed this Court's holding that the trial court erred in denying Prodinger's motion for judgment notwithstanding the verdict because the Symons Estate had not pleaded that Prodinger was vicariously liable for the negligence of Russell and therefore he was not reasonable placed on notice of the claim. The Supreme Court stated:

> The trial court instructed the jury that its decision as to defendant Dale Russell's negligence would also determine Dr. Prodinger's responsibility. Because Dr. Prodinger failed to object to that jury instruction, he cannot now disclaim vicarious liability for Russell's negligence. Although the plaintiff did not plead a cause of action based on vicarious liability against Dr. Prodinger in the compliant, the Court of Appeals dissent correctly noted that under MCR 2.118(C)(1), issues that are tried by express or implied consent of the parties, even though they are not raised in the pleadings, are treated as if they had been raised in the pleadings. [*Symons*, 484 Mich 851.]

[7] Before the settlement, the trial court had granted summary disposition in favor of Tibble and Langeland with regard to the issue of whether Hackney was negligent in failing to request a setoff for the Social Security benefits to be received by the Symons children, but the court concluded that the amount of the setoff was a question of fact for the jury.

Prodinger met with Hackney for the first time in March 2004. He indicated to Hackney that he thought the wrongful death action was defensible, though he expressed some concerns, including that it did not appear that Russell evaluated Symon's cardiovascular and pulmonary systems. Settlement was not an option as the estate demanded $1.2 million to settle, and BCEP could not pay the $900,000 difference between its policy limits and the settlement demand.[8] Additionally, Prodinger wanted the case to be tried as he did not believe that there had been any violation of the standard of care. Hackney agreed with Prodinger that the case would be tried on the standard of care and was defensible. According to Hackney, there was a strong argument that Symons came to the emergency room with symptoms that were consistent with a musculoskeletal, rather than a cardiac, problem. He had an expert, Earl Reisdorf, a well known emergency room physician, to testify that there had been no breach of the standard of care.

Hackney provided James Olivetti, a senior claims representative for AP Capital, with memoranda as the case developed. Hackney informed Olivetti that Reisdorf had testified in his deposition that Symons did not present with symptoms that were typical for coronary artery disease and that he would make a very formidable witness at trial. Another memorandum sent by Hackney discussed Prodinger's deposition and indicated that Prodinger did an excellent job and was able to sort through the convoluted nature of the questions asked by the attorney for the Symons Estate. However, in several memoranda, Hackney indicated that if the jury believed that Symons presented to the emergency room with arm pain the case would be difficult to win.[9]

The case went to case evaluation in the summer of 2005. The panel issued a non-unanimous decision in favor of the Symons Estate for $500,000, with BCEP to pay $250,000 and BCHS to pay $250,000. AP Capital rejected the evaluation.

On October 13, 2005, a month before trial, the AP Capital trial committee had a meeting, in part, to decide whether to take the case to trial. Among those present at the meeting were Olivetti and Roy Bergman, M.D. Before the meeting, Olivetti wrote a comprehensive report to the file that was also provided to the other committee members. Olivetti wrote that he, as well as the insureds, recommended taking the case to trial. Olivetti testified that he had spoken with Prodinger on a regular basis and that Prodinger held the view that the case was 100 percent defensible, that there was no violation of the standard of care, and that there was no cause for settlement. Olivetti testified that if Prodinger had requested that the case be settled that he would have acted on that request and, in acting on that request a paper trail would have been created. Dr. Bergman, who had reviewed the facts of the case, believed that the case was defensible and voted for the case to proceed to trial. He explained that Symons was young, had no family history of heart problems, did not present with symptoms that are high on the list of a cardiac event, and that the duration of his symptoms suggested something other than a cardiac event. Bergman found it significant that Dr. Reisdorf, whom he believed to be "outstanding" and one of the best emergency room physicians, found no violation of the standard of care.

---

[8] This difference is referred to as "excess judgment."

[9] At trial, Olivetti acknowledged that the medical records indicated that Symons reported arm pain at the emergency room.

A settlement conference was held on October 31, 2005. The Symons Estate continued to demand $1.2 million to settle. AP Capital made a counteroffer of $100,000, with half of the money being paid by BCHS. The Symons Estate refused the offer, but later agreed to settle for $295,000. AP Capital increased its counteroffer to $75,000, but BCHS refused to increase its offer, and settlement negotiations ended. According to Olivetti, AP Capital did not accept the settlement offer by the Symons Estate because Prodinger wanted to go to trial and there was a strong argument that there had been no violation of the standard of care.

A few days after the settlement conference, the Symons Estate settled with BCHS for $25,000. Olivetti testified that, after the Symons Estate settled with BCHS, he was not concerned that Prodinger and BCEP could be forced into bankruptcy if they lost at trial. He disagreed, however, that AP Capital chose to "roll the dice," knowing that regardless of the outcome at trial it would only have to pay the policy limits of $300,000. He reiterated that Prodinger wanted to go to trial and that there was expert support for the case.

Prodinger, who did not attend the settlement conference, was pleased when he learned that the Symons Estate had dropped its settlement demand. He explained that a few days before the settlement conference, a forensic pathologist had issued a report with the conclusion that the thrombus that caused Symon's heart attack was in the coronary artery for 12 to 24 hours before Symons died. Because Symons died within 12 to 24 hours after his emergency room visit, the report made Prodinger uncomfortable with the merits of the defense. According to Prodinger, he then had a conversation with Hackney during which they talked about the consequences if the Symons Estate won at trial. When Hackney indicated that the verdict would be at least $1 million, Prodinger told him that the case needed to get settled within policy limits. Hackney told him to write a letter to Hackney indicating that he could not absorb such a loss. On November 13, 2005, Prodinger wrote a letter to Hackney that authorized AP Capital to settle the case within policy limits. The president of BCEP also signed the letter. Prodinger believed that the letter was clear that he wanted the case settled within policy limits. Dawn Hart, the office manager for BCEP, testified that she typed the letter for Prodinger and that Prodinger was not happy about settling because he felt that there had been no violation of the standard of care. However, he would rather settle than take the case to trial.[10] Neither Hackney nor Olivetti viewed Prodinger's letter as a demand to settle the case. Hackney testified that if a physician wants a case settled, he must write, "I hereby demand . . . ."

On the first day of trial, with authority from AP Capital, Hackney offered the Symons Estate $100,000 as a settlement. The offer was rejected, and the Symons Estate did not make a counteroffer. Hackney testified that he and Prodinger sat next to each other during trial and that he spoke with Prodinger at the end of each day of trial. Olivetti testified that he had lunch with Prodinger on the first day of trial and that Prodinger continued to want to try the case. Prodinger admitted that, during trial, he never told Hackney or Olivetti that he wanted the case settled. He

---

[10] Prodinger testified that he knew that if the case settled for more than $200,000 that his name would be reported to the National Practitioners' Data Bank, which is a "black mark" on a physician's name, but he was willing to take the mark to get the case settled.

also admitted that the November 13, 2005, letter was the only communication in which he requested a settlement.

During the course of the trial, Hackney wrote reports. After Prodinger testified, Hackney wrote that Prodinger did a wonderful job. Hackney reported that Prodinger, who had not been reluctant to testify, was disappointed with the limited cross-examination by the attorney for the Symons Estate because he wanted to tell his side of the story. Olivetti testified that Prodinger's attitude was not consistent with someone who wants a case settled.

Hackney testified that it became evident during trial that the main issue was whether Symons had arm pain when he went to the emergency room, and that the jury may have believed that Symons had arm pain. However, both he and Prodinger believed that the jury's verdict was the result of sympathy.

Hackney testified that he did not hear any representation by Prodinger that he wanted the case settled until he was removed from the case by AP Capital. In all of their discussions before, during, and after trial, Prodinger indicated that he wanted the case to be tried. Hackney testified that he did not act with reckless disregard in handling the case.

Dr. Gregory Henry, a board-certified emergency physician and a past president of an offshore insurance company, opined that AP Capital acted in bad faith, which he generally equated with wanton disregard or recklessness, when it failed to settle with the Symons Estate. He believed it was "very close" whether the standard of care had been violated and that the case was not a "slam dunk" for AP Capital, especially where the deceased is a young parent with three dependent children. He further noted that because the Symons Estate had settled with BCHS, the "deep pocket" had been removed, and the damages would fall on Prodinger and BCEP in the event of a verdict for the Symons Estate. Dr. Henry also noted that Hackney knew that the case would be difficult to win if the jury believed that Symons had arm pain. Additionally, he found the substance of Prodinger's letter to AP Capital to be clear that he wanted the case settled within policy limits. Given all these factors, and where the reduced settlement was within policy limits, Dr. Henry opined that it was reckless for AP Capital to try the case.

David Cooper, an experienced medical malpractice attorney, testified that an insurance company acts in bad faith when it acts in an arbitrary, reckless, or indifferent manner toward its insured. After reviewing the file, Cooper opined that that it was a "no-brainer" that AP Capital had the responsibility to settle the case. Cooper explained that his decision was based on several factors. First, there was the letter from the forensic pathologist indicating that Symons died from a heart attack and that Symons was suffering from the heart attack when he first appeared in the emergency room. Second, Hackney recognized that, if the jury found that Symons had reported arm pain, the case was "over" because the experts recognized that, if there was arm pain, a cardiovascular examination needed to be performed and that examination would have revealed the heart attack. Third, the initial settlement demand of $1.2 million was similar to what the damages would be if AP Capital lost at trial. Cooper noted that Hackney had decided not to use his own economist and instead accepted the amount of damages offered by the Symons Estates' economist. Fourth, because the Symons Estate had settled with BCHS, all damages above $300,000 would be the responsibility of Prodinger and BCEP. According to Cooper, when the

Symons Estate dropped its settlement demand to $295,000, it was reckless, arbitrary, and indifferent for AP Capital not to settle the case.

William Tourney, an attorney who specializes in defending medical malpractice cases, opined that the standard of bad faith was whether the insurance company acted recklessly or arbitrarily. Tourney opined that AP Capital did not act in bad faith by not settling the case. He explained that it would be reckless for an insurance company to take a case to trial when it had no supporting expert testimony. Here, however, Reisdorf, a very reputable expert in emergency medicine, opined that the care was appropriate. In addition, Tourney believed that the attorney for the Symons Estate sent a message that the Estate's case was "not good" when he settled with BCHS for $25,000. Tourney testified that the case did not present an unusual fact pattern, and that it is not uncommon for a person who is released from an emergency room to suffer an untoward event. He further testified that it is exceedingly rare not to have a sympathetic plaintiff, and that cases where exposure is above policy limits often go to trial. He stated that, irrespective of policy limits and sympathy, one must look at the merits of the case. According to Tanoury, based on the medicine practiced and the opinion of the experts who reviewed the case, it was reasonable for AP Capital to take the case to trial. Tanoury also testified that he saw nothing in the file, other than Prodinger's letter authorizing settlement, to indicate that Prodinger did not want the case to go to trial.[11]

Bruce Leaman, director of claims at Henry Ford Health System, which is self-insured, testified that bad faith exists when an insurance company operates counter to the interests of the insured and fails to take into consideration the best interests of the insured. He opined that AP Capital acted reasonably and in good faith, and he saw no evidence that AP Capital acted recklessly, indifferently, or arbitrarily toward Prodinger. Leaman explained that AP Capital had expert support, and that the file indicated that Prodinger handled himself well at his deposition. According to Leaman, the fact that a physician believes that the care provided complied with the standard of care and comes across well at a deposition is an indication that the case is one that should be defended. He found nothing to indicate that Prodinger had any concerns about the case. Additionally, the post-trial statement of Prodinger, included in a memo by Olivetti, indicated that he believed there was no way that the standard of care was violated and that giving the Symons Estate $295,000 was not justified.

According to Langeland, when BCEP filed for bankruptcy all of its assets and liabilities were turned over to the bankruptcy estate. After some administrative disbursements, the assets in the bankruptcy estate totaled $516,687. The Symons Estate is the only remaining creditor of the bankruptcy estate. He testified that if it was determined that there was no bad faith by AP

---

[11] Tanoury testified that if Prodinger really wanted the case settled, that intent would appear in multiple locations in the file. He noted that after the letter was written, Prodinger had ample opportunity, including four days of trial, to demand a settlement. He also noted that the notes in the file indicated that Prodinger was disappointed that he was not more vigorously cross-examined at trial. Such an attitude, according to Tanoury's experience, was not consistent with a physician who did not want to be in trial.

Capital, he would distribute these funds to the Symons Estate. However, if it was determined that AP Capital acted in bad faith, he would collect money from AP Capital, pay off the Symons Estate judgment, and return any surplus to BCEP.

According to Tibble, after Prodinger filed for bankruptcy he was allowed to keep his house, airplane, and retirement plan. The largest asset in the bankruptcy estate was the bad faith claim against AP Capital. Tibble acknowledged that the legal malpractice claim had also been surrendered to the bankruptcy estate and that the claim was settled for $350,000. Prodinger had been discharged from the Symons Estate judgment, but the Symons Estate was a creditor of Prodinger's bankruptcy estate. Therefore, any judgment against AP Capital in the bad faith action would be used to pay the Symons judgment.

The jury found that AP Capital had acted in bad faith in failing to negotiate a settlement with the Symons Estate. The damages awarded by the jury reflect the amount of damages that were requested by Tibble and Langeland. Tibble requested damages in the amount of $204,776.64, which was the amount of Tibble's attorney fees in appealing the Symons judgment and in filing for bankruptcy.[12] Langeland requested damages in the amount of $1,497,723, which represented $155,672 for BCEP's attorney fees in appealing the Symons judgment and filing for bankruptcy, $654,738 for the amount of BCEP's assets confiscated by him after BCEP filed for bankruptcy, and $687,313 for the amount remaining on the Symons Estate judgment after the assets in BCEP's bankruptcy estate were paid to the Symons judgment.

The trial court entered judgment against AP Capital and in favor of Tibble and Langeland. On AP Capital's motion, the court granted a setoff of $350,000, the amount of the legal malpractice settlement, to the amount of damages awarded by the jury to Langeland, and entered an amended judgment.

## IV. THE INSTRUCTION ON BAD FAITH

AP Capital asserts that the trial court erred when it refused to give the special jury instruction on bad faith requested by AP Capital. It argues that the trial court erred when it failed to include the words "arbitrary" and "intentional" in the definition of bad faith, and when it failed to include specific examples of conduct that do not constitute bad faith. This Court reviews de novo claims of instructional error.[13] *Alfieri v Bertorelli*, 295 Mich App 189, 197; 813

---

[12] During trial, the trial court ruled that, because Prodinger had received a discharge from the Symons Estate judgment, Tibble could not collect on the judgment. However, Tibble could still collect for Prodinger's attorney fees.

[13] Tibble and Langeland argue that AP Capital's claim of instructional error is not preserved. "To preserve an instructional issue for appeal, a party must request the instruction before instructions are given and must object on the record before the jury retires to deliberate." *Heaton v Benton Constr Co*, 286 Mich App 528, 537; 780 NW2d 618 (2009). After all the testimony had been received but before the jury was instructed, the trial court informed the parties regarding how it intended to instruct the jury on bad faith. Tibble and Langeland had no objections to the instruction. However, AP Capital "suggest[ed]," per its own instruction, that

NW2d 772 (2012). "Instructional error warrants reversal if it resulted in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be inconsistent with substantial justice." *Ward v Consolidated Rail Corp*, 472 Mich 77, 84; 693 NW2d 366 (2005). "Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury." *Case v Consumers Power Co*, 436 Mich 1, 6; 615 NW2d 17 (2000).

An insured may sue its insurer for acting in bad faith in refusing to settle. *J & J Farmer Leasing, Inc v Citizens Ins Co of America*, 472 Mich 353, 356 n 3; 696 NW2d 681 (2005); *Commercial Union Ins Co v Liberty Mut Ins Co*, 426 Mich 127, 134-135; 393 NW2d 161 (1986). There is no standard jury instruction on the definition of bad faith. "[W]hen the standard jury instructions do not adequately cover an area and a party requests a supplemental instruction, the trial court is obligated to give the instruction if it properly informs the jury of the applicable law and is supported by the evidence." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 451; 750 NW2d 615 (2008). A supplemental jury instruction, which is to be modeled as nearly as practicable after the standard jury instructions, must be concise, understandable, conversational, unslanted, and nonargumentative. *Stoddard v Mfr Nat'l Bank of Grand Rapids*, 235 Mich App 140, 163; 593 NW2d 630 (1999).

AP Capital submitted a proposed supplemental instruction on bad faith that was structured after an instruction on bad faith set forth in *Commercial Union Ins Co*, 426 Mich 127. After all of the testimony was presented, the trial court informed the parties of the instruction on bad faith that it intended to give:

> Plaintiffs have alleged that defendant AP Capital failed or refused to settle the underlying medical malpractice lawsuit within the applicable policy limits in bad faith. You must decide whether AP Capital has acted in bad faith. An insurance company acts in bad faith when it recklessly or indifferently disregards the interests of its insureds or when it was motivated by the desire to protect its own interests at the expense of its insureds.
>
> . . . acts of bad faith may include one or more of the following: A[,] rejecting a reasonable settlement offer within its policy limits; B, failing to initiate settlement negotiations when warranted by the circumstances; C, disregarding the advice of an attorney; D, failing to take an appeal following an excess verdict when there are reasonable grounds for such appeal especially when recommended by trial counsel.

AP Capital requested that the trial court include the words "arbitrary" and "intentional disregard" in the definition of bad faith. Citing *Commercial Union Ins Co*, 426 Mich 127. AP Capital also

---

the instruction include the words "arbitrary" and "intentional" in the definition of bad faith, as well as a description of conduct that does not establish bad faith. The trial court decided not to change its proposed instruction. AP Capital did not specifically state that it "objected" to the trial court's instruction. However, AP Capital's request for a specific instruction preserved the claim of instructional error. *Id*.

requested that the jury be instructed regarding what did not constitute bad faith.[14]  The trial court refused AP Capital's request to amend its instruction.  The court explained:

> Because I used the word recklessly or indifferently in my mind that eliminates the aspect of mere negligence.  Now, as it relates to the balance of your request, when I say it may include one or more of the following, it seems to me that that does take into consideration – when I will certainly allow the lawyers to argue – that negligence is not included and that there could be legitimate reasons for not settling.  We use the word recklessly and indifferently, and those two are strong words so I will not change what I have proposed.

"A mistake of judgment is not bad faith."  *City of Wakefield v Globe Indemnity Co*, 246 Mich 645, 656; 225 NW2d 643 (1929) (opinion of SHARPE, J.).  [The lead opinion in *Wakefield* was written by Justice FEAD.  However a majority of the justices signed the opinion of Justice SHARPE.]  Justice FEAD wrote:

> Undoubtedly the insurer does not act in bad faith it if refuses settlement in the honest belief that it has a fair chance of victory, or of keeping the verdict within the policy limit, or, upon reasonable grounds, that the compromise is amount is excessive, or if it has legal defenses, as yet undetermined by a court of last resort, which fairly seem applicable, as the question of seasonable notice to the city of the claim of injury may have been in the instant case.  There may be other bona fide reasons for refusal to compromise.  On the other hand, arbitrary refusal to settle for a reasonable amount, where it is apparent that suit would result in a judgment in excess of the policy limit, indifference to the effect of refusal in a judgment in excess of the policy limit, failure to fairly consider a compromise and facts presented and pass honest judgment thereon, or refusal upon grounds which depart from the contract and the purpose of the grant of power, would tend to show bad faith.  [*Id*. at 652-653.]

In *Commercial Union Ins Co*, 426 Mich at 133, the trial court gave the following instruction on bad faith:

> The term bad faith as used in these instructions may be defined as involving insincerity, dishonesty, disloyalty, duplicity, or deceitful conduct; it

---

[14] AP Capital argued in part:

> [W]e believe that there ought to be some statement about the whole paragraph of Commercial Union that says good faith denials, offers of compromise, or other honest errors of judgment are not sufficient to establish bad faith. It goes on at great length, but it talks about negligence isn't enough.  Bad judgment is not enough.  In other words, there's not balancing instruction in my mind in what the court just read.  It's pretty close, but it needs at least a sentence to say not everything in the world is bad faith.

implies dishonesty or concealment. An honest mistake of judgment is not in and of itself bad faith and no single fact is necessarily decisive of the issue. [Emphasis omitted.]

The Supreme Court agreed that, because bad faith is something less than fraud, the instruction erroneously increased the plaintiff's burden of proof. *Id*. at 136-137. It then stated:

Contrary to holdings in some other jurisdictions, bad faith should not be used interchangeably with either "negligence" or "fraud." Michigan has reached this conclusion in the past. Accordingly, we define "bad faith" for instructional use in trial courts as arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty.

Good-faith denials, offers of compromise, or other honest errors of judgment are not sufficient to establish bad faith. Further, claims of bad faith cannot be based upon negligence or bad judgment, so long as the actions were made honestly and without concealment. However, because bad faith is a state of mind, there can be bad faith without actual dishonesty or fraud. If the insurer is motivated by selfish purpose or by a desire to protect its own interests at the expense of the insured's interests, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent. [*Id*. at 136-137.]

The Supreme Court continued that, although it "has articulated here a precise definition of 'bad faith' for instructional purposes," there are supplemental factors that a fact-finder may consider in determining whether bad faith existed. *Id*. at 137-138. The supplemental factors are:

1) failure to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interests of the insured,

2) failure to inform the insured of all settlement offers that do not fall within the policy limits,

3) failure to solicit a settlement offer or initiate settlement negotiations when warranted under the circumstances,

4) failure to accept a reasonable compromise offer of settlement when the facts of the case or claim indicate obvious liability and serious injury,

5) rejection of a reasonable offer of settlement within the policy limits,

6) undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high,

7) an attempt by the insurer to coerce or obtain an involuntary contribution from the insured in order to settle within the policy limits,

8) failure to make a proper investigation of the claim prior to refusing an offer of settlement within the policy limits,

9) disregarding the advice or recommendations of an adjuster or attorney,

10) serious and recurrent negligence by the insurer,

11) refusal to settle a case within the policy limits following an excessive verdict when the chances of reversal on appeal are slight or doubtful, and

12) failure to take an appeal following a verdict in excess of the policy limits where there are reasonable grounds for such an appeal, especially where trial counsel so recommended. [*Id*. at 138.]

It is within a trial court's discretion to determine which supplemental factors, if any, to include in the jury instructions. *Id*. The Supreme Court concluded:

In applying any factors, it is inappropriate in reviewing the conduct of the insurer to utilize "20-20 hindsight vision." The conduct under scrutiny must be considered in light of the circumstances existing at the time. A microscopic examination, years after the fact, made with the luxury of actually knowing the outcome of the original proceeding is not appropriate. It must be remembered that if bad faith exists in a given situation, it arose upon the occurrence of the acts in question; bad faith does not arise at some later date as a result of an unsuccessful day in court. [*Id*. at 137.]

Here, the language of AP Capital's proposed instruction came directly from *Commercial Union Ins Co*. The trial court's instruction deviated from AP Capital's proposed instruction in three ways: (1) it did not include the words "arbitrary" and "intentional" in the definition of bad faith; (2) it did not state that good-faith denials, offers of compromise, or other honest errors of judgment are not sufficient to establish bad faith; and (3) it did not state that it is inappropriate to review an insurer's conduct with 20-20 hindsight vision. AP Capital contends only that the first two deviations constituted error.

We conclude that the trial court erred when it denied AP Capital's request to include the words "arbitrary" and "intentional" in the definition of bad faith. In *Commercial Union Ins Co*, 426 Mich at 136-137, the Supreme Court articulated a precise definition of "bad faith" for instructional purposes: bad faith is "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty." Trial courts are required to follow a decision of the Supreme Court until it is overruled or modified by the Supreme Court. *Boyd v W G Wade Shows*, 443 Mich 515, 523; 505 NW2d 544 (1993), overruled in part on other grounds *Karaczewski v Farbman Stein & Co*, 478 Mich 28; 732 NW2d 56 (2007), overruled in part *Bezeau v Palace Sports & Entertainment, Inc*, 487 Mich 455; 795 NW2d 797 (2010). Thus, where the Supreme Court has provided the instructional definition of bad faith, and where AP

Capital requested that the jury be instructed with the definition, the trial court was required to give the instruction.[15]

The trial court's instruction on bad faith was "somewhat imperfect" because it omitted the words "arbitrary" and "intentional." *Case*, 463 Mich at 6. AP Capital asserts that this imperfection was prejudicial because the two omitted words denoted "a higher level of disregard" than the words "reckless" and "indifferent," thereby making it easier for the jury to equate bad faith with negligence. The basis for AP Capital's argument is the following statement from Justice LEVIN'S concurrence in *Commercial Union Ins Co*:

> The terms "arbitrary, reckless, indifferent" have varying meanings depending on the context.
>
> It has been said that some authorities hold that the term "reckless" means "no more than 'negligence,' while others hold that [the term means] 'wantonness or bordering on willful,' and there is also a meaning between these two extremes." 76 CJS, p 63. The same encyclopedia states that the term has been held in particular cases to "imply mere inattention to duty; thoughtlessness; indifference; heedlessness; carelessness; and nothing more than mere negligence." *Id*. [*Commercial Union Ins Co*, 426 Mich at 140 (LEVIN, J., concurring).]

Justice LEVIN disagreed with the Supreme Court's instructional definition of bad faith and stated that to instruct the jury in the "abstract . . . without reference or regard to particular circumstances[] could readily cause jury misunderstanding and lead to erroneous results." *Id*. at 140-141 (LEVIN, J., concurring).

A person is negligent when he or she fails to exercise the reasonable care that a reasonably careful person would exercise under the circumstances. See *Case*, 463 Mich at 7. AP Capital has not presented this Court with any authority holding that "reckless" means nothing more than negligence. Moreover, AP Capital makes no argument that the jury, upon being instructed that an insurance company acts in bad faith when it "recklessly" or "indifferently" disregards the interests of its insured or when it is motivated by the desire to protect its own interests at the expense of the insured, would conclude that bad faith could be equated with negligence. A dictionary definition of a word provides how the word is commonly and ordinarily understood. See *Holland v Trinity Health Care Corp*, 287 Mich App 524, 528; 791 NW2d 724 (2010) (stating that a court may consult a dictionary to determine the plain and

---

[15] We find, however, that the trial court did not err when it refused AP Capital's request to include in the bad faith instruction a statement that good faith denials, offers of compromise, or other honest errors of judgment are insufficient to establish bad faith. The Supreme Court in *Commercial Union Ins Co* did not intend that its statement that "[g]ood faith denials, offers of compromise, or honest errors of judgment are not sufficient to establish bad faith" to be included in the definition of bad faith. This sentence was the first sentence of the paragraph that followed the Supreme Court's instructional definition of bad faith. Where the sentence begins a new paragraph, it was clearly not intended to be part of the instructional definition for bad faith.

ordinary meaning of an undefined term in a contract). "Reckless" is defined as "utterly unconcerned about consequences; rash; careless." *Random House Webster's Dictionary* (2000). "Indifferent" is defined, in pertinent part, as "without interest or concern; not caring; apathetic." *Random House Webster's Dictionary* (2000). We agree with the trial court's statement that "recklessly" and "indifferently" are strong words and that they eliminate the aspect of negligence. To be "utterly unconcerned about consequences" or to be "without interest or concern" and "apathetic," an insurance company has done more than fail to act as a reasonable insurance company would under the circumstances. Accordingly, we conclude that the trial court's "somewhat imperfect" instruction on bad faith does not require reversal. Because the jury was instructed that an insurance company acts in bad faith when it "recklessly" or indifferently" disregards the interests of its insured, the applicable law regarding bad faith, on balance, was adequately and fairly presented to the jury and AP Capital was not prevented from arguing that its failure to settle with the Symons Estate, even if negligent or the result of bad judgment, did not constitute bad faith. *Case*, 463 Mich at 6.

In arguing that the trial court's instruction on bad faith was prejudicial, AP Capital claims that the experts presented by Tibble and Langeland presented inaccurate information to the jury. First, it contends that Cooper denied that "bad faith requires a 'higher intentionality.'" A review of Cooper's testimony, however, reveals that Cooper testified consistently with the statements by the Supreme Court in *Commercial Union Ins Co*, 426 Mich at 136-137, when he testified that an honest error of judgment did not constitute bad faith and that bad faith is a state of mind described as arbitrary, indifferent, or reckless. A review of Henry's testimony regarding bad faith is confusing and subject to two different interpretations. One could interpret his testimony as stating that an insurance company acts recklessly if it does not do what reasonably prudent people would do. Or, one could interpret his testimony as stating that one must determine whether an insurance company, upon not acting as would reasonably prudent people, acted recklessly. Given the ambiguous nature of Henry's testimony, we conclude that the testimony did not render the trial court's "somewhat imperfect" instruction on bad faith as one requiring reversal. The unambiguous expert testimony, which not only came from Cooper but also from AP Capital's experts, was that bad faith required more than an honest mistake of judgment.

AP Capital further argues that the trial court's instruction was prejudicial because its experts testified that its conduct was reasonable, while Henry testified that the decision whether to go to trial was a judgment call that could have "gone either way." However, a review of Henry's testimony reveals that he did not suggest that the decision to go to trial could have gone either way. Rather, Henry testified that it was a "very close call" whether the standard of care was violated, that the case had a "reasonable potential for loss," and that it was "not a slam dunk winner." He also testified that Prodinger and BCEP had a 40 percent chance of winning, but that this meant that there was a "huge error rate." He characterized the medical legal system as a "crap shoot." The fact that the case was "not a slam dunk winner" for AP Capital and that there was a "huge error rate" were factors that led Henry to conclude that it was reckless for AP Capital not to settle with the Symons Estate. Tanoury testified that he believed that AP Capital's decision to take the case to trial was a reasonable decision, as did Leaman. Specifically, Leaman testified that he believed AP Capital acted "reasonably, in good faith." Because Tanoury and Leaman also testified that bad faith requires a reckless or arbitrary disregard of the insured's interests or a failure to consider those interests, their testimony that AP Capital acted reasonably cannot be read as stating that bad faith equates to negligence.

-14-

In sum, although the trial court erred when it failed to include the words "arbitrary" and "intentional" in the instructional definition of bad faith, the error does not require reversal. On balance, the applicable law regarding bad faith was adequately and fairly presented to the jury. AP Capital was not prevented from arguing that its failure to settle did not constitute bad faith, and no expert witness unambiguously testified that bad faith equaled negligence.

## II.  BANKRUPTCY AND THE BAD FAITH CLAIM

AP Capital argues that, because the obligations of Prodinger and BCEP to pay the Symons judgment were eliminated in the Chapter 7 bankruptcies, Prodinger and BCEP have not been damaged by AP Capital's failure to settle with the Symons Estate. Therefore, AP Capital claims that Tibble and Langeland, who are subject to all defenses that could have been asserted against Prodinger and BCEP, have failed to establish that they are entitled to any relief. AP Capital relies on *Frankenmuth Mut Ins Co v Keeley (Keeley I)*, 433 Mich 525; 447 NW2d 691 (1989), and *Frankenmuth Mut Ins Co v Keeley (On Rehearing) (Keeley II)*, 436 Mich 372; 461 NW2d 666 (1990).

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Moser v Detroit*, 284 Mich App 536, 538; 772 NW2d 823 (2009). Summary disposition is proper under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." This Court reviews legal questions de novo. *Brown v Loveman*, 260 Mich App 576, 591; 680 NW2d 432 (2004). Similarly, this Court reviews de novo a trial court's ruling on a motion for directed verdict. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). A motion for directed verdict should be granted only if the evidence, when viewed in the light most favorable to the nonmoving party, fails to establish a claim as a matter of law. *Id*.

### A.  *Keeley I* and *Keeley II*

Before *Keeley I* and *Keeley II* were decided, the Supreme Court held that a claim against an insurer for bad faith sounds in contract. *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 422-423; 295 NW2d 50 (1980). It also held that an insurer's liability for a breach of the duty to defend its insured was limited to an amount equal to the insured's assets not exempt from legal process. *Stockdale v Jamison*, 416 Mich 217, 228; 330 NW2d 389 (1982).

In *Keeley I*, 435 Mich 525, the issue before the Supreme Court was the remedy for an insurer's bad faith failure to settle. Justice ARCHER, who wrote the lead opinion, explained the two schools of thought:

> The jurisdictional split is distinguished by the following doctrines: the prepayment rule and the judgment rule. The older prepayment rule is the doctrine, adopted by a minority of jurisdictions, which dictates that an insurer may be held liable in an "excess" case *only* if part or all of the judgment has been paid by the insured. The judgment rule, adopted by a majority of jurisdictions, commands an insurer to pay an excess judgment in instances of bad faith, so that the insured need not make any payment nor have the capacity to pay any part of

the judgment in order to recover the excess amount from the insurer. [*Keeley I*, 433 Mich at 535 (emphasis in original).]

Justice ARCHER, with whom three justices concurred, adopted the judgment rule. *Id*. at 539-541, 544. He explained that the "major flaw" with the prepayment rule was that an insurer, if fortunate enough to have an insured that was insolvent, suffered no consequence for its failure to meet the good faith standard and that the judgment rule was the most effective way to underscore the serious concern about bad faith practices in the insurance industry. *Id*. at 539. He further explained that an insured, even one with little or no assets, suffers injury when an excess judgment is obtained against him. *Id*. at 540. He explained that the excess judgment will impair the insured's credit, force him into bankruptcy, diminish his reputation, and subject his property to a lien and his earnings to garnishment. *Id*.

In dissent, Justice LEVIN, with whom two justices agreed, stated that he would apply *Stockdale* to a case where an insurer acted in bad faith in failing to settle. Justice LEVIN agreed "that the prepayment rule, requiring an insured to have made some payment on the judgment, is unsound and that the judgment rule is in general the better approach." *Keeley I*, 433 Mich at 553. However, he went on to state:

> Adoption of the judgment rule approach does not, however, justify eliminating the sense of the prepayment rule that the insurer should not be required to pay more than the insured is able to pay on the judgment. We agree with Chief Judge Fuld of the New York Court of Appeals who said:
>
> > "I do not suggest—although there are a number of decisions so holding—that an insured must pay the judgment before he, or another on his behalf, is able to proceed against a bad faith insurer. *However, there must be some showing that he has been damaged*. In the case before us, there is not the slightest evidence, or even intimation, that the insured was harmed by the judgment, that he had any assets which were imperiled or that either his reputation or credit was impaired.
> >
> > "In short, the complaint in this case should be dismissed not only because there is no evidence that the insurer acted in bad faith but also because there is no proof that the insured suffered any damage." [*Gordon v Nationwide Mutual Ins Co*, 30 NY2d 427, 441; 285 NE2d 849 (1972). Emphasis added.]
>
> Judge Keeton has expressed the following view:
>
> > "When it seems almost certain the insured will never pay anything at all on the excess judgment if the claim against the insurer is denied, *arguments that the insured has been damaged by the increase in debts are rather weak support for any cause of action at all, much less for a measure of damages equal to the amount of the increase in the insured's debts*. However, other

-16-

courts have concluded that the entry of judgment against a person constitutes a loss and that the insured's 'loss does not turn on whether the judgment has been satisfied.' Since, absent a discharge of the obligation through a bankruptcy proceeding, the third party's judgment can remain as an outstanding obligation for extended periods of time, in many circumstances there is considerable uncertainty in regard to predicting whether the insured may ultimately have resources or assets that may be taken to satisfy some portion of the judgment.

"Third party claimants are not in a position to assert that they were harmed as a result of the insurer's conduct in regard to having not settled the tort claim. *The insurer's duty was to the insured, not to the claimant.* Furthermore, in one sense, a third party benefits from the insurer's refusal to settle because the insurer's refusal to settle resulted in the claimant's obtaining a judgment in excess of the amount the claimant had offered to accept in settlement. Thus, although the third party claimant deserves further compensation, the theoretical justification for imposing liability on the insurer, which is harm to the insured, *does not warrant a recovery by such a claimant any more than the innocent victims of an underinsured tortfeasor would be entitled to indemnification beyond the amount of the applicable coverage from a liability insurer who had not refused a settlement.*" [Keeton & Widiss, Insurance Law, § 7.8(i)(1), pp 899-900. Emphasis added.] [*Id*. at 554-556.]

Justice LEVIN noted that an action for bad-faith failure to settle sounds in contract, not tort. *Id*. at 556-557. He explained that "[c]ontract damages seek to place the aggrieved party in the same *economic* position he would have been in had the contract been performed" and that "[c]ontract damages are generally measured by the loss to the promisee, not the loss or gain to some other person." *Id*. at 557-558 (emphasis in original). According to Justice LEVIN, one could argue that the Supreme Court, by adopting the judgment rule, "no longer restricts plaintiffs claiming bad-faith settlement practices to recovery of pecuniary loss and has recognized a kind of hybrid cause of action sounding in contract, but actually allowing recovery of losses akin to punitive damages." *Id*. at 562.

Justice LEVIN reached the following conclusion:

We would accept the judgment rule insofar as it dispenses with the need to establish that [the insured] paid any amount on the judgment and would, as did the Court of Appeals, remand to the trial court for a determination of the extent of [the insured's] assets not exempt from legal process and, additionally, for a determination of the value of the excess portion of the judgment—now over $600,000 including accrued interest plus additional interest as it accrues—taking into account not only [the insured's] assets not exempt from legal process but also

his prospects of attaining in the future additional assets from which the judgment could be collected.

We thus propose a compromise between the prepayment and the judgment rule: that this Court accept the essence of the judgment rule by eliminating the need to show partial payment, but provide protection for insurers along the lines of the prepayment rule by precluding collection on the judgment from the insurer beyond what is or would actually be collectable from the insured. [*Id*. at 562-565.]

Justice LEVIN further explained what should happen on remand:

The court should, in determining [the insured's] prospects of attaining in the future additional assets, consider his educational achievement and plans for future education, his skills, present and prospective, and the job opportunities that might be available to him.

I would prefer to direct entry of a judgment declaring that [the insurer] is *subject to liability* (not that it is liable) for the $600,000 excess plus interest as it accrues, but would not require [the insurer] to pay any amount in respect to that judgment unless and until and then only to the extent [the holder of the excess judgment] can establish that [the insured] is collectable.

As and when [the insured] acquires assets, greater income, inheritance, whatever, [the holder of the excess judgment] could seek a declaration requiring [the insurer] to pay an amount equivalent thereto. The judgment against [the insurer] would substitute for the judgment against [the insured], so that [the insured's] credit would no longer be adversely affected. The burden thus imposed on [the holder of the excess judgment] would be no greater than in any case where there is inadequate insurance—he could only recover to the extent he could find attachable or garnishable assets.

[The holder of the excess judgment] would be better off because he need not actually attach or garnish, and there should be a minimum of judicial proceedings. Such a judgment should not be subject to any statute of limitations. There would be no possibility of bankruptcy discharge of [the insured's debt]. [*Id*. at 565 n 28.]

In *Keeley II*, after granting rehearing, the Supreme Court adopted Justice LEVIN's dissent in *Keeley I*. *Keeley II*, 436 Mich at 376. The Supreme Court stated that it was "now convinced that the rule articulated in Justice LEVIN's dissent represents the better measure of an insurer's liability when the insurer exhibits bad faith that causes a judgment against its insured in the underlying tort suit which exceeds the policy limits." *Id*.

### B. Procedural History – Summary Disposition

After BCEP filed for bankruptcy, AP Capital moved for summary disposition under MCR 2.116(C)(10) on BCEP's bad faith claim. AP Capital argued that, because a claim for bad

faith was a claim for breach of the insurance contract, the only damages available were economic damages or, in other words, "the payment of the excess judgment shown to have been caused by the alleged bad-faith failure or refusal to settle within policy limits." And, according to AP Capital, it could not be disputed that Langeland, because he stands in the shoes of BCEP, was subject to the same defenses and limitations to which BCEP would be subject. AP Capital claimed that because BCEP had been discharged from the Symons judgment and, therefore, was relieved from all responsibility for payment of the judgment, nothing was collectable from BCEP. Therefore, pursuant to *Keeley I* and *Keeley II*, BCEP had not suffered any damages from AP Capital's bad faith. According to AP Capital, *McClarty v Gudenau*, 176 BR 788 (ED Mich, 1995), held that there are no damages resulting from an excess judgment when the debtor has filed for bankruptcy and has been discharged from the judgment.

In support of its motion, AP Capital presented the trial court with BCEP's 2007 petition for bankruptcy. It also presented BCEP's list of unsecured creditors. Included on the list was the Symons Estate, which had a stated claim of $1.16 million against BCEP.

In response, Langeland asserted that, because corporations do not receive discharges in bankruptcy, BCEP remains liable, at the completion of the bankruptcy proceedings, for any unpaid amount of the Symons judgment. In addition, Langeland argued that BCEP had suffered economic damages from AP Capital's bad faith. BCEP was solvent when the Symons judgment was entered and, after it filed for bankruptcy, assets in the amount of $585,321.72 were seized. According to Langeland, the only way that BCEP could be made whole was if AP Capital paid the entire amount of the Symons judgment, as well as the administrative costs of the bankruptcy, so that BCEP could recover the value of the assets that were seized. AP Capital could not simply pay BCEP the amount of the assets that were seized because all payments by AP Capital belonged to BCEP's bankruptcy estate. Langeland noted that a distinction was drawn in *Keeley I* between a solvent insured and an insolvent insured and that the pertinent cases cited by Justice LEVIN held that an insured who was solvent before the excess judgment was entered was entitled to recover the full amount of the judgment.

In support of its arguments, Langeland presented the trial court with an affidavit signed by him. Langeland averred that the assets of BCEP's bankruptcy estate included $585,321.72, which represented accounts receivable. He had made mock distributions of the funds and, under those distributions, the Symons Estate would receive a minimum payment of $376,150.47 or $354,597.05. Langeland also averred that, after the funds of the bankruptcy estate were distributed, the unpaid portion of the Symons judgment would remain as a debt for BCEP because "corporate debts" are not dischargeable in bankruptcy. He further averred that the only way an amount equal to the seized accounts receivable could be returned to BCEP was if he "collects the full amount of the excess judgment from A.P. Capital and Randy Hackney, plus the costs of administration, which includes a one-third attorney fee [for James Ford, counsel for Langeland] and the costs of litigation."

In reply, AP Capital acknowledged that corporations do not receive discharges in bankruptcy, but stated that Langeland's suggestion that the unpaid portion of the Symons Judgment would remain enforceable against BCEP was "a serious exaggeration." It explained that the purpose of a Chapter 7 bankruptcy for a corporate debtor is the liquidation of assets and distribution of the proceeds to creditors. According to AP Capital, there was no reason to

suppose that BCEP would have any continuing existence after the bankruptcy proceedings were completed. It had ceased doing business, and at the conclusion of the bankruptcy proceedings, it would become defunct with its assets having been distributed for payment to creditors.

The trial court denied AP Capital's motion for partial summary disposition. It held that there were significant factual issues yet to be resolved and that, but for the Symons Judgment, BCEP would be "a solvent continuing" corporation and that Langeland has standing on behalf of BCEP to pursue recovery if liability exists. It noted that BCEP, because no dissolution documents had been filed, remained in existence.

Then, after Prodinger filed for bankruptcy, AP Capital moved for summary disposition under MCR 2.116(C)(10) on Prodinger's bad faith claim. It repeated the arguments it had asserted when it moved for summary disposition on BCEP's claim for bad faith. In support of its motion, AP Capital presented the trial court with Prodinger's petition for bankruptcy. The petition listed the Symons Estate as one of several creditors.

In response, Tibble noted that a provision in the insurance policy that AP Capital had issued to BCEP stated that the bankruptcy of the insured shall not relieve AP Capital of its obligations. This provision, according to Tibble, was fatal to AP Capital's motion for summary disposition because AP Capital had agreed that the bankruptcy of Prodinger would not relieve it of its obligations arising under the policy. Tibble also argued that Prodinger was solvent when the Symons judgment was entered and that he had suffered economic damages because of AP Capital's bad faith. Damages awarded in the legal malpractice case against Hackney would be paid to the Symons Estate, rather than to Prodinger. In addition, Prodinger sustained nearly $100,000 in attorney fees for appealing the Symons judgment and in filing for bankruptcy. Tibble noted that there was a distinction in *Keeley I* between solvent and insolvent insureds and that Justice LEVIN explained that when an insured is solvent at the time of the excess judgment, the judgment rule applies. Therefore, he was entitled to the collect the full unpaid amount of the Symons judgment. Tibble further noted that Justice LEVIN specifically disavowed limiting the measure of damages to the insured's assets exempt from legal process. In addition, Tibble asserted that a discharge in bankruptcy has "the identical legal effect" on a bad faith claim as a covenant not to sue: neither extinguished the debt. He asserted the same argument based on *J & J Farmer Leasing Co, Inc*, 472 Mich 353, that he presents on appeal.

In support of his arguments, Tibble presented the trial court with the insurance policy that AP Capital issued to BCEP. The insurance policy stated, in part:

> Bankruptcy or insolvency of the NAMED INSURED, CERTIFICATE HOLDER, or ADDITIONAL INSURED shall not relieve the Company of any of its obligations under this POLICY.

Tibble also presented the trial court with the schedule of Prodinger's personal property. Included in the schedule were Prodinger's claim for legal malpractice against Hackney and his claim for bad faith against AP Capital. At the hearing on AP Capital's motion, Tibble presented the trial court with statements regarding two brokerage accounts that Prodinger had in 2005. One of the accounts was a 401(k), but the other account was not. This account had a market value of $306,000 on December 5, 2005. Tibble also presented a document from a law firm that

-20-

indicated Prodinger had paid in excess of $90,000 to prepare and file his bankruptcy petition. In reply, AP Capital asserted that the insurance policy, pursuant to its own language, only required it to pay damages up to the policy limits if Prodinger filed for bankruptcy.

The trial court denied AP Capital's motion for summary disposition because there were fact issues that needed to be resolved and because as "a matter of policy" the creditor of a bankruptcy estate could not be left "high and dry" from any recovery. The trial court explained the policy matter:

> And it is abundantly clear that when Dr. Prodinger filed [for] bankruptcy he was solvent. And the figure that was provided to me this morning was $306,583 market value in his portfolio with Charles Schwab, does not include any and all other assets that the doctor may have had at the time of filing. The point of it is, he clearly was solvent.
>
> Whether or not he is collectible it seems to me is not an issue because he is not collectible at this point. . . .
>
> But, frankly, I cannot overlook for both legal and policy reasons the decision from the Fifth Circuit in Stanley v Trencher [sic]. And the thing that struck me when I reviewed that was more from a policy point of view. . . . I do think Keeley is distinguishable because I think it is important as to whether or not the debtor is solvent or insolvent.
>
> But in the Fifth Circuit opinion the following appears, and I really think this is important: The mere fact that due to debtor's negligence in bankruptcy he was relieved of any personal liability on a pre-petition judgment entered against him as a result of the attorney's alleged malpractice during their representation of debtor as defendant in the civil rights action did not necessarily mean that the trustee who stood in the debtor's shoes in pursing debtor's legal malpractice claim would be unable to establish that debtor had sustained the necessary loss as a result of the attorney's allegedly negligent representation.
>
> Under Louisiana law as predicted by the Fifth Circuit Court of Appeals it would be improper to excuse attorneys from liability for their alleged malpractice based solely on financial misfortunes of their client in allowing the trustee to pursue these legal malpractice claims on behalf of the estate despite debtor's bankruptcy discharge[,] would not threaten the primary purpose behind the discharge that is avoiding financial harm to the debtor.
>
> Now, in this case it focussed [sic] on the legal malpractice, but I believe as a matter of policy it would carry over to this excess coverage issue.
>
> It's clear to me that there is one point three million dollars still owing on the malpractice verdict. It's clear to me that Dr. Prodinger has sustained at this point economic damages at least in two areas, the loss of the Charles Schwab brokerage account, and the payment to the law firm of $93,028.90, and not to

permit those issues to ultimately [be] resolved by a finder of fact, be it a jury or a judge, in my view would not be fair.

## C. Procedural History – Motion for Directed Verdict

In its trial brief, AP Capital stated that Tibble and Langeland were seeking to recover (1) "the entire unpaid balance of the over-limit judgment" and (2) the attorneys fees that were incurred as a result of the Symons judgment. AP Capital informed the trial court that, if the case proceeded to trial, it would ask the court to reconsider "its prior decisions regarding recovery of the unpaid balance of the over-limit judgment." It stated that the evidence at trial would show that Prodinger, who had received a discharge from the Symons judgment, and that BCEP, which had gone defunct, could not be harmed by the Symons judgment because neither can ever be required to pay a penny toward it. It argued that, "because no amount of the excess judgment can be collected from either [Prodinger or BCEP], the unpaid balance of the over-limit judgment can no longer be awarded as damages for the alleged bad-faith refusal to settle . . . ."

During trial, AP Capital requested a directed verdict on a couple of grounds. First, it referenced its trial brief and asked for a directed verdict on Tibble's claim with regard to the "unpaid excess judgment." AP Capital stated that there was no evidence Prodinger paid or will pay anything on the judgment. Second, with regard to Langeland's claim, AP Capital requested a directed verdict on the excess judgment above the amount of $354,000, which was "the amount" in Langeland's affidavit. AP Capital did not request a directed verdict on "the appellate attorney fees because [the trial court] said those were part of the claimable damages." However, it requested a directed verdict on the bankruptcy attorney fees requested by Langeland. AP Capital argued that, although there were ledger sheets of attorney fees, the jury would have to speculate to determine which fees were related to the bankruptcy. The trial court denied the motion as it related to the bankruptcy attorney fees. Regarding the Symons judgment, the trial court granted, in part, the motion. It stated:

> I am going to grant his motion only on that amount that is the difference between the Symons verdict, together with the accrued interest, less the amount of money Mr. Tibble and Mr. Langeland now have on hand, and for the purposes of this motion I will determine that the value of the accounts receivable is $650,000 and nothing more.
>
> So when you add all of the things together that the trustees have, as I said before, you're really over a million, 347 and 350 from Hackney. You're already there at $700,000. If you got 650 alone in an accounts receivable, that's $1,350,000 . . . . So [AP Capital] may end up getting absolutely nothing in terms of a directed verdict. . . .
>
> * * *
>
> What I'm going doing [sic], I'm not cutting out in my view what Dr. Prodinger has the right to recover back from the trustee that he had to surrender. I am not cutting out what the professional corporation had to surrender. Again for purposes of argument if there had not been bad faith on the part of A.P. Capital,

-22-

both the P.C. and Prodinger would have never had to surrender assets to the trustees. To the extent that they had to surrender assets to the trustees, that's the amount of damage that A.P. Capital is going to have to pay. Prodinger doesn't have to pay another penny on that judgment.

Later during trial, when the trial court was discussing the verdict form, it reversed its ruling that Langeland would only be allowed to recover the amount of assets surrendered by BCEP. It stated:

Now I'm going to segue very briefly to the fact that as far as [BCEP is] involved, the jury will be able to return money to satisfy the Symons Judgment once the value of the assets that the trustees have in hand are determined.

. . . and this is what I'm going to do is tell the jury, the trustees have assets in hand. And they're going to go pay the Symons first because under bankruptcy law the Symons have priority over BCEP and Dr. Prodinger. If there is bad faith, BCEP and Dr. Prodinger are entitled to be put back whole, and that means getting back the property that they have had to surrender as well as costs that they have incurred as a result of the bad faith.

So in reality the jury could be dealing with a specific number, that is to say, here is the Symons Judgment with interest to date which is "X" number of one point something million dollars. The trustees have in hand already payments from A.P. Capital, accounts receivable, checking accounts, 401(k)'s, whatever. . . . The trustees have in hand monies that may or may not satisfy the Symons Judgment. If they don't have enough in hand to pay that judgment, then the jury will be instructed that if they find bad faith, they can award the differential in what they have on hand and to pay the Symons in full because Symons have to be paid before BCEP and Prodinger get paid.

If the Symons verdict can be fully satisfied with the monies the trustees have on hand, then that gets the Symons out of this case. If there's money left over, then we begin the process of reimbursing the trustees on behalf of the plaintiffs in whose shoes they stand. If there is a shortfall, then the jury will be allowed to return an amount of money that covers that shortfall that puts Dr. Prodinger and BCEP back in the position they were.

Mr. Bush [counsel for AP Capital], I understand your argument. It's been made many times, that as a factual matter BCEP doesn't exist any more, but under the law that is a valid liability that if they were [to] rise like Phoenix out of the ashes and come into assets in [sic] the estate was still open, the trustee could recover that so I frankly deny and disapprove that argument.

Prodinger is different. He has been discharged. And that's why I would not allow the jury to return a verdict in his bankruptcy case, but the amount -- the possible amount still lives in the BCEP case.

So I wanted to clarify what will ultimately go to the jury in this case. First, was there bad faith. If there was not bad faith, then do not answer any other questions. If there was bad faith, you are to determine what the damages are . . . .

So in terms of setoffs, yes, the jury will be allowed to consider the setoffs. In terms of the trustee's [sic] fees, no. The thought that went through my mind, frankly, when I read this was in the normal case a jury is never told the lawyer [is] going to take a third off the top . . . . That's why I'm not going to do it with the bankruptcy trustees. There may be some shortfall, but the point of it is the jury will return an amount of money to which it could be said to Mr. Langeland, you now have enough money -- before you take out your fees and so on -- but you have enough money from what the jury has done to Symons, to make them whole, and if the jury finds bad faith, then both for BCEP and Prodinger, the jury is going to say here is the amount of money that will put them back in the position they were in had they not been in their forced to file bankruptcy.

The trial court clarified that Tibble, while he could collect the attorney fees that Prodinger had lost, could not collect on the Symons judgment.

AP Capital then asked the trial court if it was altering its previous order that Tibble could only collect the attorney fees that Prodinger sustained in filing for bankruptcy from the Hackney defendants. The trial court responded:

As it relates to Dr. Prodinger, it is the bankruptcy fees first, and more important, I think he's entitled to recover. Where that recovery comes from, whether it is solely from Hackney or a part of A.P. Capital and Hackney's money, I'm not prepared to say at this point in time. What I am prepared to say is that this argument can be made to the jury based upon the evidence that has been submitted. And if, in fact, we get down to the point post verdict as to the allocation of the award of the bankruptcy costs and fees that Dr. Prodinger had to pay, I will be at that time prepared to say "X" percent comes from what the jury has awarded, and A.P. Capital will pick up that remaining percentage.

The trial court instructed the jury in accordance with its statement on damages:

You should include each of the following elements of damages which you decide has been sustained by the plaintiffs to the present time: as it relates to Dr. Prodinger, attorney fees; as it relates to Battle Creek Emergency Physicians, attorney fees, surrendered assets, and the amount needed to pay off the remaining unpaid portion of the Symons Judgment. Which, if any, of these elements of damage have been proved is for you to decide based upon evidence and not upon speculation, guess, or conjecture.

-24-

D. Analysis[16]

AP Capital's motions for summary disposition on the bad faith claims were based on the fact that BCEP and Prodinger had filed for Chapter 7 bankruptcy. Chapter 7 bankruptcy deals with liquidation. 9 Am Jur 2d, Bankruptcy, § 42, p 94. "[T]he objective of a Chapter 7 [bankruptcy] is to cause appointment of an independent trustee to marshal and liquidate the assets of the estate for pro rata distribution among the class of creditors." *In re Conference of African Union First Colored Methodist Protestant Church*, 184 BR 207, 218 (Bankr D Del, 1995).[17] The trustee of a bankruptcy estate owes a "singular duty" to the estate. *Beaty v Hertzberg & Golden, PC*, 456 Mich 247, 261; 571 NW2d 716 (1997). "They may act only for the purpose of directly benefiting the estate in bankruptcy and the creditors in general. They may not represent the interests of individual creditors or shareholders." *Id*. The debtor is a creditor of the bankruptcy estate. See 11 USC 726(a)(6). However, a debtor is only entitled to a distribution if the trustee has satisfied all allowed claims and has money left over. *In re Nagle*, 286 BR 213, 216 (BAP CA 8, 2003).

When a debtor files a petition for a Chapter 7 bankruptcy, all of the debtor's assets become property of the bankruptcy estate. *Schwab v Reilly*, 560 US 770, 774; 130 S Ct 2652, 2657; 177 L Ed 2d 234 (2010). A bankruptcy estate is generally comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 USC 541(a). "[I]t is well established that the 'interests of the debtor in property' include 'causes of action.'" *Bauer v Commerce Union Bank*, 859 F2d 438, 441 (CA 6, 1988), cert den 489 US 1079; 109 S Ct 1531; 103 L Ed 2d 836 (1989). The right to pursue these causes of action belongs to the trustee of the bankruptcy estate for the benefit of the estate. *Id*. However, the trustee is subject to the same defenses or limitations that a defendant could have asserted against the debtor. *In re Giorgio*, 862 F2d 933, 936 (CA 1, 1988).

The bankruptcy court shall generally grant the debtor in a Chapter 7 bankruptcy a discharge. See 11 USC 727(a). The discharge of a debt protects the debtor from any personal

---

[16] In Issue III, *infra*, Tibble argues that the trial court erred when it held that he was precluded from recovering any portion of the Symons judgment from AP Capital. Following trial, AP Capital moved for partial judgment notwithstanding the verdict (JNOV) or, in the alternative, remittitur, arguing that the amount needed to pay off the Symons judgment was not an element of damages authorized by law in a bad faith action against an insurance company. The trial court denied the motion. In Issue IV, *infra*, AP Capital argues that the trial court erred in denying its motion for partial JNOV. The parties' arguments regarding Issues III and IV concern, in part, Justice LEVIN's opinion in *Keeley I*. This opinion addresses all arguments regarding *Keeley I* in Issue II.

[17] Numerous opinions from lower federal courts are cited in this opinion. Although this Court is bound to follow the decisions of the United States Supreme Court construing federal law, it is not bound by decision of the lower federal courts. *State Treasurer v Sprague*, 284 Mich App 235, 241; 772 NW2d 452 (2009).

liability on the debt. *Green v Walsh*, 956 F2d 30, 33 (CA 2, 1992). 11 USC 524(a) states, in pertinent part, that a discharge:

> (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged . . . .

> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor . . . .

The "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 USC 524(e). The language of 11 USC 524 illustrates that Congress wanted to free the debtor of his personal obligations while ensuring that no one else reaps the same benefit. *Green*, 956 F2d at 33.

However, a bankruptcy court shall not grant a discharge of a debt to a debtor in a Chapter 7 bankruptcy unless the debtor is an individual. 11 USC 727(a)(1). Thus, the debts of a corporation are not discharged. *Nat'l Labor Relations Bd v Better Building Supply Corp*, 837 F2d 377, 378-379 (CA 9, 1988). The policy behind Congress's decision not to grant discharges of debt to corporations is the prevention of trafficking in corporate shells and bankruptcy partnerships. *In re Tri-R Builders, Inc*, 86 BR 138, 140 (Bankr ND Ind, 1986). See also *Nat'l Labor Relations Bd*, 837 F2d at 379 ("The primary concern underlying this section was to prevent businesses from evading liability by liquidating debtor corporations and resuming business free of debt."); *In re Liberty Trust Co*, 130 BR 467, 472 (WD Tex, 1991) (stating the intent of Congress was to preclude the continued existence of such corporations). The corporation, at the close of the bankruptcy proceedings, becomes "defunct." *In re Rack Engineering Co*, 212 BR 98, 103 (Bankr WD PA, 1997); *In re Liberty Trust Co*, 130 BR at 473; *In re Fed Insulation Dev Corp*, 14 BR 362 (Bankr SD Ohio, 1981). A "defunct" corporation has been defined as one with "a status akin to that of a dissolved corporation or partnership." *In re Liberty Trust Co*, 130 BR at 471. However, the Ninth Circuit has stated that a corporate debt survives the bankruptcy proceedings and is charged against the corporation if it, or an alter ego of it, resumes operations. *Nat'l Labor Relations Bd*, 837 F2d at 379.

If BCEP and Prodinger had not filed for bankruptcy, the damages that AP Capital would have had to pay for its failure to settle with the Symons Estate is an amount equal to "what is or would actually be collectable from the insured[s]." *Keeley I*, 433 Mich at 565 (opinion of LEVIN, J.). The issue before the Court is how the Chapter 7 bankruptcies of BCEP and Prodinger affect the amount of damages that AP Capital must pay for its bad faith. Before specifically addressing this issue, we will address arguments that Tibble and Langeland make about Justice LEVIN's opinion in *Keeley I*.

First, in response to AP Capital's motions for summary disposition, Tibble and Langeland argued that in *Keeley I* a distinction was drawn between insureds who were solvent when the excess judgment was entered and those who were insolvent. According to the bankruptcy trustees, cases cited by Justice LEVIN established that the judgment rule applied to

solvent insureds. On appeal, Langeland does not repeat this argument. However, Tibble makes the argument.

There is no genuine issue of material fact that BCEP and Prodinger were solvent when the Symons judgment was entered.[18] The Symons judgment was entered in December 2005. Langeland averred that he collected $585,321.72 in accounts receivable from BCEP. Prodinger, at the time of the Symons judgment, had more than $300,000 in a brokerage account.

The insured in *Keeley I* earned $150 a week and was "in no position to pay the $200,000 excess judgment against him." *Keeley I*, 433 Mich at 540. After Justice LEVIN stated that he agreed the prepayment rule was unsound and that the judgment rule was the better approach, he wrote in a footnote that "the issue which divides us is how the judgment rule should be applied where the insured is not able to pay the amount of the judgment." *Keeley I*, 433 Mich at 553 n 15. Justice LEVIN cited numerous bad faith failure-to-settle cases from other jurisdictions where the courts adopted the judgment rule, but because the cases contained no indication whether the insured was solvent, he stated that the cases were not on point. *Id*. Justice LEVIN then cited bad faith failure-to-settle cases from other jurisdictions where the courts adopted the judgment rule and that contained some discussion of the solvency of the insured or whether the insured had or would be able to pay all or part of the judgment. *Id*. According to Justice LEVIN, because those cases discussed the solvency of the insured, the cases were on point, but clarified that in most of the cases, there was "little or no discussion, inadequate analysis, and no discussion, in any of them, of alternatives such as those adverted to in part III of this opinion." *Id*.

Then, after stating that he agreed with Chief Judge Fuld of the New York Court of Appeals, who stated that a complaint must be dismissed absent a showing by the insured that he was damaged, Justice LEVIN wrote in a footnote:

> See also *Levantino v Ins Co of North America*, 102 Misc 2d 77; 422 NYS2d 995 (1979), where the court declared that in ascertaining damages when the insured pays part of the judgment or is solvent at the time of the judgment, the judgment rule applies and he is entitled to the full amount of the excess as his damages; where he was insolvent before the judgment and obtained a discharge in bankruptcy thereafter, he is not damaged and may not recover; and where he was insolvent or nearly insolvent prior to judgment, the jury must consider his past, his prospects, and other economic factors and assess his damages.
>
> Similarly see *Anderson v St Paul Mercury Indemnity Co*, 340 F2d 406 (CA 7, 1965), where the United States Court of Appeals for the Seventh Circuit held that because an insured was solvent before judgment was entered, he could recover the full amount of the judgment in excess of policy limits from an insurer

---

[18] The term "solvent" is defined as being "able to pay all just debts." *Random House Webster's College Dictionary* (2000). The term "insolvent" means "having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due." Black's Law Dictionary (7th ed).

who in bad faith failed to settle. See also *Gregersen v Aetna Casualty & Surety Co*, 241 F Supp 204 (SD NY, 1964). [*Id*. at 554-555 n 16.][19]

Tibble relies on this footnote to argue that, because Prodinger was solvent at the time the Symons judgment was entered, he is entitled to recover the full amount of the excess judgment.

We reject the argument that a distinction must be made between insureds who were solvent when the excess judgment was entered and those who were insolvent. Footnote 16 was included in Part II of Justice LEVIN's opinion, where Justice LEVIN stated why he disagreed with Justice ARCHER's adoption of the judgment rule for insureds who are unable to pay the excess judgment. When Justice LEVIN subsequently announced his compromise rule—precluding collection on the excess judgment from the insurer beyond what is or would actually be collectable from the insured—he made no distinction between solvent and insolvent insureds. Moreover, when Justice LEVIN's compromise rule was adopted by the Supreme Court in *Keeley*

---

[19] In *Anderson*, Leon Allison sued James Goldsberry for personal injuries sustained in an automobile collision. Following a jury trial, judgment was entered against Goldsberry in the amount of $75,000. The insurance company with whom Goldsberry had an automobile insurance policy paid the policy limits of $15,000. Because Goldsberry was unable to pay the excess judgment, he filed for bankruptcy. The trustee of the bankruptcy estate sued the insurance company and obtained a judgment of $60,000. On appeal, the insurance company argued that the trustee was without capacity to sue because Goldsberry had not sustained any actual loss. It relied on *Harris v Standard Accident & Ins Co*, 297 F2d 627 (CA 2, 1961), where the Second Circuit held that when the insured was insolvent before the excess judgment was entered, paid none of it, and obtained a discharge in bankruptcy, the complaint for bad faith must be dismissed because the insured had not suffered any loss. The Seventh Circuit in *Anderson*, assuming but not deciding the correctness of *Harris*, held that *Harris* was factually distinguishable because "Goldsberry was not insolvent prior to the entry of the judgment and but for the judgment would not have become a bankrupt." *Anderson*, 340 F2d at 409. The Seventh Circuit also stated that, even absent distinguishing *Harris*, "it is axiomatic and the underlying philosophy of bankruptcy law that in exchange for a discharge of all liability of the bankrupt, the Trustee in Bankruptcy takes all rights of the bankrupt arising therefrom. . . . Any asset or chose in action of the bankrupt which could have been enforced by the bankrupt had he not gone into bankruptcy automatically vests in and becomes the property of the Trustees in Bankruptcy." *Id*.

In *Gregersen*, a diversity suit that involved a bad faith failure-to-settle claim, the issue was raised if the required jurisdictional amount was lacking. A judgment had been entered against the plaintiff in an amount of $14,500 above the $50,000 limit of the policy. In its complaint, the plaintiff requested damages in the amount of $14,500. The district court concluded that, although the plaintiff had only paid $10,000, the entire $14,500 amount was collectable. It distinguished the case from *Harris*, stating that the plaintiff was always solvent, paid part of the excess judgment, and has not been discharged from paying the remainder. *Gregersen*, 241 F Supp at 205. It stated, "Under such circumstances we can see no point in requiring the plaintiff to prove actual payment. The duty and ability to pay an enforceable judgment seems proof enough to us of financial damage." *Id*.

*II*, the Supreme Court made no distinction between solvent and insolvent insureds.  It stated: "[W]e are now convicted that the rule articulated in Justice LEVIN's dissent represents the better measure of an insurer's liability when the insurer exhibits bad faith that causes a judgment against its insured in the underlying tort suit that exceeds the policy limits." *Keeley II*, 436 Mich at 376.  This statement by the Supreme Court leaves no room for a conclusion that the judgment rule applies to solvent insureds and that Justice LEVIN's compromise rule only applies to insolvent insureds.  The statement of the Supreme Court indicates that the compromise rule provides the measure of an insurer's liability in all bad faith claims against insurers.

Second, in response to AP Capital's motion for summary disposition, Tibble argued that Justice LEVIN specifically disavowed adopting the amount of the insured's assets exempt from legal process as the measure of damages.  Tibble reasserts the argument to this Court.

Justice LEVIN provided a footnote after he stated that he "would accept the judgment rule insofar as it dispenses with the need to establish that [the insured] paid any amount on the judgment and would . . . remand to the trial court for a determination of the extent of [the insured's] assets not exempt from legal process." *Keeley I*, 433 Mich at 562.  In the footnote, Justice LEVIN stated:

> Judge Keeton suggested that the injured person's recovery be limited to "an amount equal to the insured's net assets which are not exempt from legal process."  While we would not so limit the injured person's recovery, we otherwise agree with his analysis:

> (4) Comment:  Liability to the Extent of a Solvent Insured's Net Assets

> It should be possible to formulate a workable doctrine (1) that fully protects the insured from loss, (2) that does not result in eliminating the 'penalty' on the insurer, and (3) that does not produce a 'windfall' for the third party claimant.  One of the reasons that such a solution has not been developed probably is that opposing advocates have generally chosen to advance the more extreme positions, rather than intermediate positions that would involve a more limited measure of damages that would conform to such a doctrine or theory of liability. . . .

> The appropriate measure of damages, when an insured is entitled to a recovery that is in excess of the applicable liability insurance policy limits, should be the amount needed to make the insured whole by placing the insured in the same position that would have existed had there been no breach of the duty to settle.  Furthermore, this sum should be established after taking into account the amount, if any, that the third party claimant could have realized upon rights against the insured if there had been no cause of action for liability in excess of policy limits—that is, after taking into account how much could have been recovered above the insurance policy limits against an insured who had some assets, but not enough that the third party could recover more than could have been recovered against the insured. *This might be done by permitting a single recovery against the insurer on the excess liability claim, at the instance of either*

*the insured or the third party claimant, in an amount equal to the insured's net assets which are not exempt from legal process, and holding that the claimant's tort judgment against the insured is fully discharged by payment of this sum to the claimant either by the insured or by the insurer on the insured's behalf.* Although in some instances this amount may be somewhat more than the net recovery the claimant would otherwise have realized (apart from the excess liability claim) *this approach* certainly more closely approximates that recovery and it *provides full protection of the insured's financial position from the consequences of the insurer's wrong to the insured in failing to settle.*

\* \* \*

The financial interests of both the insured and the third party claimant are better served by the solution proposed in the preceding paragraph than by leaving them to other legal processes, such as a bankruptcy proceeding, the cost of which would have an adverse impact on the interests of each. This proposal may not be fully within the scope of avoidable consequences rules as thus far developed, because decisions applying this concept have been concerned with mitigating damages in a different sense. However, it is within the scope of the principle underlying the avoidable consequences rule: the principle that even though a person can show that in fact losses have been greater, legal relief is limited to what that person would have been entitled to receive if reasonable actions had been taken to minimize the harm.

Even though a claimant's tort claim has already been reduced to judgment, the underlying spirit of exemption and bankruptcy laws expresses a public policy that there should be a reasonable limitation on the hardship the claimant is permitted to impose by strict enforcement of the judgment. In this context, the availability of a cause of action against the insurer in excess of its policy limits offers a distinctive opportunity—not generally existing in other settings involving judgment creditors—for achieving at least as much as could be attained for the claimant through enforcement of the judgment as far as the exemption and bankruptcy laws would permit, but without incurring the costs of bankruptcy to the claimant himself and to the insured. It seems consistent with the principles underlying both the avoidable consequences doctrine, the exemption rules, specifically, and the bankruptcy laws, generally, to adopt this intermediate measure of damages in excess liability claims.

\* \* \*

The only realistic alternative to such an intermediate solution is to set the measure of damages in these cases at the full amount of the judgment, a solution that would disadvantage the insured and others like the insured by increasing the costs of low-limit liability insurance. [Keeton & Widiss, Insurance Law, § 7.8(i)(4), pp 903-905. Emphasis added.] [*Id*. at 562-564 n 27.]

Tibble is correct that Justice LEVIN did not limit the measure of damages to the amount of the insured's assets exempt from legal process. Justice LEVIN stated that collection on the judgment from the insurer is precluded beyond "what is *or* would actually be collectable from the insured." *Id*. at 565 (emphasis added). Thus, under Justice LEVIN's compromise rule in *Keeley I*, recovery is not limited to the assets not exempt from legal process currently held by the insured, but also includes additional nonexempt assets that the insured might obtain in the future. In his statement regarding the appropriate measure of damages, Judge Keeton did not include additional assets that the insured might obtain in the future. The inclusion of these additional assets in the amount that can be recovered from the insured provides the explanation for Justice LEVIN's statement that "we would not so limit the injured person's recovery."

A theme that runs throughout the arguments of Tibble and Langeland is that, based on Justice LEVIN's opinion in *Keeley I*, Prodinger and BCEP are entitled to be "made whole," i.e., they are entitled to be placed in the same position that would have existed had there been no bad faith by AP Capital. And, Tibble and Langeland generally assert that, because Prodinger and BCEP will not receive any money until Tibble and Langeland have paid off the Symons judgment, the only way that Prodinger and BCEP can be made whole is if AP Capital pays the entire unpaid amount of the judgment. The fact that Prodinger and BCEP filed for bankruptcy makes this case difficult. Because the bad faith claims are part of the bankruptcy estates, *Bauer*, 859 F2d at 441, any money received for AP Capital's bad faith in failing to settle with the Symons Estate goes to Tibble and Langeland. Thus, AP Capital cannot give any money directly to Prodinger and BCEP. Tibble and Langeland must use any money received from AP Capital to pay off the creditors of the bankruptcy estates. Only if, after paying all the allowed claims, there is money remaining in the bankruptcy estates can Tibble and Langeland make distributions to Prodinger and BCEP. See 11 USC 726(a)(6); *In re Nagle*, 288 BR at 216.

We reject the proposition that, where an insured has filed bankruptcy after a judgment over its policy limits is rendered against it due to its insurer's bad faith failure to settle, the insured is entitled to be "made whole," or placed in the same economic position that it would have existed absent the insurer's bad faith. Because a debtor is not entitled to any distribution from the bankruptcy trustee unless money remains after all allowed claims have been paid, 11 USC 726(a)(6); *In re Nagle*, 288 BR at 216, an insurer, to make the insured "whole," may have to pay an amount that greatly exceeds the excess judgment if there are creditors of the bankruptcy estate other than the holder of the excess judgment. For example, if the bankruptcy estate had seven creditors, in addition to the holder of the excess judgment, the insurer would have to give enough money to pay the excess judgment *and* the claims of the other seven creditors before any money would be distributed to the bankrupt insured. This could result in the insurer paying thousands of dollars more than the amount of the excess judgment.[20]

---

[20] We acknowledge that this situation will not arise in the present case. According to the trial testimony of Tibble and Langeland, the Symons Estate is the only creditor of the two bankruptcy estates. Thus, AP Capital would not have to pay off any allowed claims of other creditors before any distributions were made to Prodinger and BCEP.

In its motions for summary disposition, AP Capital asserted that *McClarty*, 176 BR 788, "well made" the point that, because BCEP and Prodinger had filed for bankruptcy and had immunized themselves from collection of the Symons judgment, nothing is or would be collectable from them. In *McClarty*, an automobile negligence action, a judgment of $1 million was entered against the debtor. Thereafter, because her insurance policy had a limit of $250,000, and because she faced personal exposure of $750,000, the debtor filed for bankruptcy. The debtor received a discharge of the debt. The trustee of the bankruptcy estate filed a legal malpractice claim against the defendants, who had represented the debtor in the negligence action. The defendants moved to preclude the trustee from seeking as damages the $750,000. They argued that, because the $750,000 debt had been discharged, the debtor had not suffered any damages as a result of their alleged malpractice. The district court agreed. *McClarty*, 176 BR at 790. It explained that one of the elements that the trustee needed to prove to succeed on the legal malpractice claim was actual damages suffered by the debtor. *Id*. It reasoned that, because the debtor received a discharge of the $750,000 debt and no longer owed the excess judgment, the trustee, who stood in the shoes of the debtor and was subject to the same defenses that could be asserted against the debtor, was unable to prove damages in the amount of the excess judgment. *Id*. The district court stated that Justice LEVIN's opinion in *Keeley I* supported the contention that "if a party directly responsible for a debt will not pay it, then creditors will also be unable to recover the debt from indirectly liable third parties." *Id*. at 791. The district court concluded its opinion:

> [The trustee] by law has nothing more and nothing less than what the Debtor has in the way of damages, and, by virtue of her discharge, she no longer suffers any direct economic loss from the excess judgment. Plaintiff will be allowed, however, to introduce proofs on any injuries that the Debtor suffered as a result of Defendants' alleged malpractice in the form of damage to her credit rating and emotional well-being. [*Id*. at 793.]

The Fifth Circuit has chosen not to follow the *McClarty* decision.[21] In *In re Segerstrom*, 247 F3d 218 (CA 5, 2001), following an automobile collision, a judgment of more than $8.5 million was rendered against the debtor. The debtor's insurance policy had a limit of $75,000. After an involuntary bankruptcy petition was filed against the debtor, the debtor's personal liability on the judgment was discharged. The trustee of the debtor's bankruptcy estate sued the defendants, who had represented the debtor, for legal malpractice. The defendants moved for summary judgment, claiming, among other arguments, that any negligence by them did not cause the debtor any injury because her personal liability on the $8.5 million judgment was discharged. The district court accepted this argument, as well as another argument, and granted summary judgment to the defendants. On appeal, the Fifth Circuit affirmed on alternative grounds. *Id*. at 223. Regarding the defendants' argument that the trustee would not be able to prove any damages, the Fifth Circuit stated:

---

[21] No court has followed the holding of *McClarty*, but *McClarty* has only been cited in a handful of opinions.

In an alternative holding, the district court determined that [the trustee] would be unable to prove any damages because [the debtor's] personal liability [on the judgment] had been discharged. *See McClarty v. Gudenau*, 176 B.R. 788, 790 (E.D.Mich.1995) (holding that a chapter 7 trustee could not recover an excess judgment against the debtor's former attorney through a legal malpractice action because the debtor's personal liability had been discharged). We do not adopt the district court's holding. In *In re Edgeworth*, this Court held that a discharged debt "continues to exist" and judgment creditors "may collect from any other source that may be liable." *In re Edgeworth*, 993 F.2d 51, 53 (5th Cir.1993); 11 U.S.C. § 524(e) (2000) ("[D]ischarge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). We noted in *Edgeworth* that the bankruptcy code's fresh start policy was not intended to allow insurers to escape obligations simply based on the "financial misfortunes of the insured." *Id.* Though *Edgeworth* does not control the present case because it involved a nominal suit against the debtor for the debtor's negligence and an insurance company's liability for that negligence, its rationale could be extended to include cases like this one. As we explained in *Edgeworth*, it makes little sense to allow those who have committed torts to escape liability because of the financial misfortunes of their victims. Moreover, allowing a cause of action to go forward on the facts of this case would not threaten financial harm to the debtor, thus the primary purpose behind the discharge would be protected. Because we are able to affirm the district court's judgment based on the issues of injury and causation under Texas law, however, we need not resolve this issue. [*Id.* at 225 n 4.]

In *Stanley v Trinchard*, 500 F3d 411 (CA 5, 2007), in a § 1983 action, a $4 million judgment was rendered against the debtor. After he was forced into involuntary bankruptcy, the debtor received a discharge on the judgment. The trustee for the debtor's bankruptcy estate sued the defendants for legal malpractice. The district court granted the defendants' motion for summary disposition, in part, on the basis that because the debtor had been discharged from the judgment, it was impossible for the trustee to show any damages from the alleged malpractice. On appeal, the Fifth Circuit first addressed the defendant's request to apply the holding of *McClarty*. *Id.* at 419. It explained that the district court, based on the decisions of *In re Edgeworth* and *In re Segerstrom*, which the district court had noted established that "a bankruptcy discharge eliminates only the debtor's personal liability and *not* the debt itself," held that summary judgment based on the debtor's discharge was not warranted. *Id.* at 419-420 (emphasis in original). The Fifth Circuit agreed with the district court, and declined the defendants' insistence that the rationale of *In re Edgeworth* did not apply. *Id.* at 420. It reasoned:

That the facts of the instant case thus differ from those operative in *Edgeworth* is of no moment here. As the district court recognized, *Segerstrom* presented facts "on all four corners" with the instant case, and we acknowledged that *Edgeworth* was not directly controlling precedent. We also acknowledged in *Segerstrom*, however, that the rationale for *Edgeworth*'s holding could properly be *extended* to cases such as this one. We accept that we are not bound, in the strictest sense, to follow the path laid out in *Segerstrom*, but we see no compelling

-33-

reason not to do so. We remain convinced that (1) it would be improper to excuse the malpractice liability of a potentially negligent attorney because of the "financial misfortunes" of his client/tort victim; and (2) allowing a legal malpractice cause of action to go forward despite the purported tort victim's bankruptcy discharge would not threaten "the primary purpose behind the discharge," i.e., avoiding financial harm to the debtor. Accordingly, we reject the rationale of *McClarty* and hold that [the] trustee for [the debtor's] bankruptcy estate, is not barred by [the debtor's] bankruptcy discharge from asserting a legal malpractice claim that had accrued to [the debtor] before commencement of his bankruptcy proceedings. [*Id.* at 420-421.]

The Fifth Circuit then addressed the trial court's ruling, which relied on Louisiana law, that granted the defendants' motion for summary judgment. *Id.* at 421. According to the Fifth Circuit, the trial court's reasons for granting the motion could not be distinguished from the holding of *McClarty*. *Id.* It explained:

The [district] court ruled . . . that [the trustee] could not prove the third element of legal malpractice, *i.e.*, that the . . . defendants' allegedly negligent representation caused [the debtor] any loss or damage. Specifically, the court determined that, as [the debtor's] bankruptcy discharge extinguished his personal liability for the judgment debt and [the trustee] offered no evidence that [the debtor] "had any additional assets that he lost, or that he was forced to make any payments to [the plaintiff in the § 1983 action]," [the trustee] could not show "that [the debtor] suffered any monetary or economic loss at all . . . ." Thus, like the *McClarty* court, the district court here failed to distinguish between [the debtor] individually and his bankruptcy estate—the very distinction that underpins *Segerstrom*. [*Id.*]

The Fifth Circuit continued its explanation:

[The debtor] never asserted a legal malpractice claim. . . . [The debtor's] accrued but unasserted malpractice claim automatically devolved to his bankruptcy estate when involuntary bankruptcy proceedings were commenced in October 2001. At that point, [the] trustee of the estate for the benefit of its creditors, became responsible, *ipso facto*, for satisfying that judgment, to the extent possible from the property of [the debtor's] bankruptcy estate; and [the debtor's] inchoate legal malpractice claim against the . . . defendants was property of the estate. The fact that [the debtor] was later discharged from personal liability for his judgment debt had no legal effect on [the trustee's] right and duty to continue pursuing that claim on behalf of the bankruptcy estate.

. . . the district court seems to have misapprehended the effect of the rule establishing that a debtor's bankruptcy estate includes any causes of action that had accrued to him *as of the time the bankruptcy case has commenced*. Adherence to this rule requires that our assessment of the estate's malpractice claim focus only on [the debtor's] financial condition at the instant bankruptcy proceedings were initiated. The record makes clear that, when [the debtor's] bankruptcy proceedings commenced, he was a multi-million dollar judgment

-34-

debtor, but he had not paid any portion of that debt. If [the debtor's] unpaid judgment debt was the result of compensable malpractice, however, the cause of action to recover damages from the tortfeasors devolved to the bankruptcy estate immediately on the initiation of [the debtor's] bankruptcy proceedings in October 2001. [The debtor's] subsequent discharge from *personal liability* through the bankruptcy proceedings is irrelevant. [*Id*. at 422 (emphasis in original).]

However, the Eighth Circuit noted that the trustee and the defendants disagreed whether the debtor's "*unpaid* judgment debt constituted a compensable legal injury." *Id*. at 422 (emphasis in original). It explained that the trustee urged it to adopt the judgment rule. *Id*. The Fifth Circuit acknowledged that the Louisiana courts had not addressed the judgment rule in the context of a legal malpractice claim, but it made an "*Erie*-guess" and predicted that Louisiana would be more likely to follow the judgment rule, rather than the prepayment rule, when faced with a situation like the present case. *Id*. at 423-424. It explained:

We agree . . . that the viability of a legal malpractice claim should not depend on the ability of the victim to satisfy all or part of a judgment against him. We do not believe that Louisiana would adopt a rule that would require its courts to recognize the legal malpractice cause of action of a solvent claimant but reject an otherwise identical action brought by a claimant forced by that very malpractice to seek bankruptcy protection. Such a rule would produce anomalous results contradictory to Louisiana's basic interests in tort deterrence and fair application of its laws. [*Id*. at 425.]

The Fifth Circuit announced its holding:

Accordingly, we hold that, at the time bankruptcy proceedings commenced, [the debtor] had incurred a legal injury—in the form of an adverse money judgment—sufficient to allow [the trustee] to assert a legal malpractice claim against the . . . defendants on behalf of [the debtor's] bankruptcy estate *and* that [the debtor's] subsequent discharge from personal liability for that judgment had no effect on the right and duty of the trustee to pursue that claim. The district court erred, therefore, in dismissing [the trustee's] legal malpractice claim against the . . . defendants based on its flawed conclusion that [the debtor] suffered no compensable injury. [*Id*. (emphasis in original).]

We decline to follow the Fifth Circuit's decision in *Stanley* in determining whether Prodinger and BCEP suffered any damages for AP Capital's bad faith. The Fifth Circuit concluded that, because it believed that Louisiana would adopt the judgment rule, the debtor, despite his discharge from the judgment, had suffered an injury for which the trustee of the bankruptcy estate could sue. Although the Supreme Court initially adopted the judgment rule, *Keeley I*, 433 Mich at 541, it subsequently rejected the judgment rule in favor of the compromise rule announced by Justice LEVIN. *Keeley II*, 436 Mich at 376. Thus, *Stanley* runs afoul of case law that is binding on this Court. See *Griswold Props, LLC v Lexington Ins Co*, 276 Mich App 551, 563; 741 NW2d 549 (2007) (stating that this Court is required to follow the decisions of the Supreme Court).

We also decline to follow the holding of *McClarty*. In *McClarty*, there was no discussion whether the debtor's bankruptcy estate included any assets other than the legal malpractice claim, such that the debtor had assets that the trustee of the bankruptcy estate used to pay the excess judgment. However, because the district court in *McClarty* wrote that $750,000, the amount of the excess judgment, remained as part of the unpaid judgment, we believe that it is reasonable to conclude that the debtor had no assets that were used to pay part of the excess judgment. In this situation, we generally agree with the district court in *McClarty*: if the debtor has been discharged from the excess judgment and no assets from the debtor have been used to pay part of the excess judgment, the debtor has not suffered damages. The debtor is generally in the same economic position despite the conduct that resulted in the excess judgment. However, if a debtor has been discharged from the excess judgment and assets were collected by the trustee of the bankruptcy estate and used to pay part of the excess judgment, it cannot be disputed that the debtor has been damaged. As a direct result of the conduct that resulted in the excess judgment, the debtor is not in the same economic position. A criticism of the prepayment rule, which Justice LEVIN agreed was unsound, is that it allows the insurer to capitalize on the poor financial condition of the insured. *Keeley I*, 433 Mich at 539. It allows there to be no consequence for an insurer's bad faith failure to settle if the insured is insolvent. *Id*. Likewise, adopting the rule of *McClarty*—that an insured, by virtue of being discharged from the excess judgment, has suffered no damages—for all situations, regardless whether assets were collected by the trustee of the bankruptcy estate and used to pay part of the excess judgment permits the insurer to capitalize on the financial condition of the insured. There is no consequence for an insurer's bad faith if the insured files for bankruptcy and is discharged from the obligation to pay the excess judgment.

Accordingly, we conclude that the damages in a bad faith action against an insurer, where the insured files for bankruptcy, is an amount equal to the debtor's assets that are collected by the trustee of the bankruptcy estate. Our conclusion advances the goals that led to the compromise rule announced in *Keeley I* by Justice Levin. First, it accepts the essence of the judgment rule by precluding the insurer from taking advantage of the insured's inability to pay the excess judgment and having to file for bankruptcy, see *Keeley I*, 433 Mich at 565 (opinion by LEVIN, J.), and provides a consequence for the insurer's act of bad faith. Second, it protects the insurer by precluding collection from the insurer beyond what is collectable from the insured by the trustee of the bankruptcy estate. See *id*. In addition, regardless of whether the insured files for bankruptcy, the liability of insurers in bad faith actions is generally the same. If the insured does not file for bankruptcy, the insurer's liability is an amount equal to the assets that are or would be collectable from the insured; if the insured files for bankruptcy, the insurer's liability is an amount equal to the debtor's assets that were collected by the bankruptcy trustee. And, the insured can make an informed decision whether to file for bankruptcy (and be discharged from the excess judgment and any other debts, while knowing that he will not receive any compensation for the assets that he surrendered) or to seek a judgment that Justice LEVIN described (where a judgment against the insurer would substitute for excess judgment against the insured).

We acknowledge that there is a distinction between an individual and a corporation who files for Chapter 7 bankruptcy. In Chapter 7 bankruptcies, individuals receive discharges of their debts, while corporations do not. 11 USC 727(a)(1). The debt of a corporation survives the bankruptcy and is charged against the corporation if it, or an alter ego, resumes operations. *Nat'l*

-36-

*Labor Relations Bd*, 837 F2d at 379. Thus, in bad faith actions where the insured is a corporation and the corporation has filed for bankruptcy, an order in favor of the insured could include provisions stating (1) that the insurer is liable for the amount of the corporation's assets that were collected by the bankruptcy trustee and (2) that the insurer is subject to liability for the remaining amount of the excess judgment and should the corporation ever resume operations and acquire assets, the insurer must pay an amount equal to the assets. Such a provision would be similar to the one described by Justice LEVIN in *Keeley I*. See *Keeley I*, 433 Mich at 565 n 28.

We now address whether the trial court erred in denying AP Capital's motion for summary disposition on Tibble's bad faith claim. In moving for summary disposition, AP Capital argued that Tibble could not prove damages in the bad faith claim against it because Tibble stood in the shoes of Prodinger and because Prodinger, who had been discharged from the Symons judgment and was uncollectable, had not been harmed by its bad faith. However, as we have concluded, the amount of damages that Tibble could collect from AP Capital for its bad faith was an amount equal to Prodinger's assets that were collected by Tibble. Thus, in arguing for summary disposition, AP Capital did not show that it was entitled to judgment as a matter of law. MCR 2.116(C)(10). It did not argue the correct method of determining the amount of its liability for its bad faith failure to settle with the Symons Estate. In addition, AP Capital would have only been entitled to summary disposition on Tibble's bad faith claim if it showed that there was no genuine issue of material fact that no assets of Prodinger were collected by Tibble. Although the trial court was presented with Prodinger's petition for bankruptcy and a schedule of Prodinger's personal property, it was presented with no evidence from either party regarding what assets, if any, were actually placed in the bankruptcy estate and the value of those assets. Accordingly, AP Capital did not present documentary evidence establishing that no assets belonging to Prodinger were placed in the bankruptcy estate. Because the trial court reached the right result on AP Capital's motion for summary disposition, albeit for a different reason, we affirm the trial court's order denying the motion. See *Messenger*, 232 Mich App at 643.

In concluding that the trial court properly denied AP Capital's motion for summary disposition, we find no merit to Tibble's argument that the Supreme Court's decision in *J & J Farmer Leasing*, 472 Mich 353, establishes that, even though Prodinger has been discharged from the Symons judgment, Tibble is entitled to pursue the bad faith claim. In *J & J Farmer Leasing*, an employee of J & J Farmer Leasing, Inc. (Farmer) was at fault for an automobile accident in which Sharyn Riley was killed. Riley's estate (Riley) sued Farmer, which was insured by Citizens Insurance Company (Citizens). Riley obtained a judgment of $3.2 million against Farmer, which exceeded the $750,000 limits of the insurance policy that Farmer had with Citizens. Farmer assigned its claim for bad faith against Citizens to Riley, and Riley agreed not to sue Farmer to collect the excess judgment as long as Farmer cooperated in the suit against Citizens. After Riley and Farmer sued Citizens for bad faith, Citizens moved for summary disposition. It argued that, because Riley had released its underlying claim against Farmer for the excess judgment, it, as Farmer's surety, was also released. The trial court denied the motion, stating that the agreement was a covenant not to sue, rather than a release, because Riley, under certain conditions, could proceed against Farmer to collect the excess judgment. This Court affirmed, but on an alternative ground. Based on its understanding of Justice LEVIN's opinion in *Keeley I*, the agreement was a release because it operated to release Farmer from the excess judgment.

On appeal to the Supreme Court, Citizens argued that the agreement was a release and that, under *Keeley I*, the bad faith claim must fail because Farmer had not suffered any damages as a result of its failure to settle. The Supreme Court rejected the argument. *Id*. at 358-357. The Supreme Court explained the difference between a covenant not to sue and a release:

> There is a material difference between a covenant not to sue and a release. A release immediately discharges an existing claim or right. In contrast, a covenant not to sue is merely an agreement not to sue on an existing claim. It does not extinguish a claim or cause of action. The difference primarily affects third parties, rather than the parties to the agreement. [*Id*. at 357-358 (citations omitted).]

Based on this difference, the Supreme Court stated that the trial court correctly concluded that the agreement was a covenant not to sue. *Id*. at 358. In addition, the Supreme Court stated that the covenant not to sue was not absolute but conditioned on Farmer performing certain duties in the action against Citizens. *Id*. Only if Farmer performed those duties did Riley's covenant not to sue become absolute and release Farmer of all liability to Riley. *Id*. According to the Supreme Court, this analysis was sufficient to resolve the matter and no resort to *Keeley I* was necessary. *Id*.

We do not find *J & J Farmer Leasing* helpful, in any way, in deciding the present case. The Supreme Court gave no guidance regarding the compromise rule announced by Justice LEVIN in *Keeley I* or the effect of a bankruptcy discharge, which are the two main facets of the present case. Moreover, the assertion by Tibble that there is "no material difference in law" between Prodinger's discharge and the covenant not to sue is wrong. The covenant not to sue did not extinguish Farmer's liability on the excess judgment. However, the discharge that Prodinger received from the Symons judgment extinguished his personal liability on the judgment. The discharge voided the Symons judgment to the extent that it made a determination of the liability of Prodinger and it acts as an injunction against any action to collect on the judgment from Prodinger. 11 USC 524(a)(1), (2).

We also conclude that the trial court reached the right result when it denied AP Capital's motion for summary disposition on the bad faith claim asserted by Langeland. In moving for summary disposition, AP Capital argued that Langeland could not prove damages because he stood in the shoes of BCEP and because BCEP, who had filed for bankruptcy and would subsequently become a "defunct" corporation, had not been harmed by its bad faith. However, the amount of damages that Langeland could recover from AP Capital was an amount equal to BCEP's assets that were collected by Langeland. Thus, AP Capital did not argue the correct method of determining the amount of its liability for its bad faith and, by doing so, failed to show that it was entitled to judgment as a matter of law. MCR 2.116(C)(10). Regardless, AP Capital was only entitled to summary disposition on the bad faith claim if it showed that there was no genuine issue of material fact that no assets of BCEP were collected by Langeland. The documentary evidence presented to the trial court showed that significant assets were placed in the bankruptcy estate of BCEP. Langeland averred that more than $585,000, representing accounts receivable, was collected by him in the administration of the bankruptcy estate. Because the trial court reached the right result on AP Capital's motion for summary disposition,

albeit for a different reason, we also affirm the trial court's order denying the motion. See *Messenger*, 232 Mich App at 643.

AP Capital also states that the trial court, in addition to erring when it denied the motions for summary disposition, erred in denying its motion for directed verdict. We assume that AP Capital's argument for why the trial court erred in denying its motion for directed verdict is the same argument it presents for why the trial court erred in denying its motions for summary disposition: because Prodinger and BCEP had filed for bankruptcy and because Prodinger had received a discharge from the Symons Judgment and BCEP was a "defunct" and liquidated corporation, meaning that no amount of the judgment can be collected from either of them, they had not suffered any damages by AP Capital's bad faith. We reject this argument. AP Capital's argument, as presented below and on appeal, is not based on the correct measure of determining the amount of an insurer's liability for its bad faith failure to settle.

### E. INSURANCE POLICY

Langeland also argues that BCEP's bankruptcy filing does not relieve AP Capital from liability for damages caused by its failure to settle with the Symons Estate because AP Capital agreed, in the insurance policy, not to use the bankruptcy of BCEP to escape any of its contractual obligations. We disagree.

Insurance policies are subject to the same principles of contract construction that apply to any other species of contract. *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005). The goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties. *Greenville Lafayette, LLC v Elgin State Bank*, 296 Mich App 284, 291; 818 NW2d 460 (2012). A court must enforce the clear and unambiguous language of a contract as written. *Id*.

Section IX.G of the insurance policy states that the "[b]ankruptcy or insolvency of the NAMED INSURED, CERTIFICATE HOLDER, or ADDITIONAL INSURED shall not relieve the Company of any of its obligations under this POLICY." The term "policy" is defined as "the complete insurance document consisting of POLICY form, Declarations, and all endorsements, and all CERTIFICATEs issued by the Company under this POLICY." The obligations of AP Capital were generally stated in section II of the policy, which provided:

### II. INSURING AGREEMENTS

In consideration of the payment of the premium, in reliance on the statements contained in the declarations, and subject to the limits of liability, exclusions, conditions and any other terms of this POLICY:

A.      The Company agrees to defend the NAMED INSURED, CERTIFICATE HOLDER, or ADDITIONAL INSURED, and to pay DAMAGEs on behalf of the NAMED INSURED, CERTIFICATE HOLDER, ADDITIONAL INSURED, or the NAMED INSURED's estate, in any CLAIM for DAMAGEs, whenever reported due to a HEALTH CARE INCIDENT which happened on or after the RETROACTIVE DATE and reported as of a date within the POLICY period of this POLICY.

B.     Only CLAIMs reported to the Company as of a date within the POLICY period of this POLICY are covered by it.  A CLAIM is deemed first reported only when the Company receives notice of either of the following:

1.     Notice to the NAMED INSURED of a written or oral CLAIM for DAMAGES or intention to hold the NAMED INSURED legally responsible for DAMAGEs, or

2.     Notice to the NAMED INSURED of a legal action based on a CLAIM for DAMAGEs.

C.     Upon receipt of notice the Company shall immediately assume its responsibility for defense against any such CLAIM.  The Company may select and retain legal counsel who shall defend under the supervision of the Company. Defense shall be maintained until 1) final judgment or other disposition of the CLAIM shall be obtained, or 2) following proceedings at the trial court level and at the Company's sole and complete discretion, all feasible remedies by appeal, writ of error, or other legal proceedings have been exhausted.  The Company will pay the cost of counsel it retains.  The Company shall not be obligated to defend the NAMED INSURED, CERTIFICATE HOLDER, or ADDITIONAL INSURED in any CLAIM after the aggregate limit of liability has been exhausted by payment of judgment or settlements.

D.     The Company shall pay premiums on appeal bonds and premiums on bonds to release attachments in any suit covered by the POLICY, but not for a bonded amount exceeding the per CLAIM limit of liability of this POLICY.  The NAMED INSURED shall pay for the bonding of any amount of excess of the limits of liability.

In addition, the policy stated that, except for the cost of defense and the limited obligation to pay premiums for bonds, the liability of AP Capital was limited to the following:

The Company's liability for DAMAGEs shall not exceed the stated limit of liability for any one CLAIM, and subject to the same limit for each CLAIM, the Company's total liability shall not exceed the stated POLICY aggregate limit of liability.

Any assessed statutorily-required pre-judgment or post-judgment interest will be paid in addition to these limits of liability.  The Company shall not, however, be liable for interest assessed on DAMAGEs above these limits of liability.

Section IX.G of the insurance policy prohibited AP Capital from using the bankruptcy of BCEP from relieving itself of any of its obligations under the policy.  The obligations of AP Capital under the policy included providing a defense and paying damages.  However, its liability for damages was not to exceed the stated limit of liability for any one claim.  It is undisputed that the stated limit of liability in the insurance policy for any one claim was $300,000 and that, following entry of the Symons Judgment, AP Capital paid $300,000, along

with the required interest, to the Symons Estate. AP Capital had no obligations under the insurance policy to pay additional amounts. Accordingly, AP Capital did not use the bankruptcy of BCEP (or Prodinger) to relieve itself of any of its obligations under the policy.

Section IX.G of the insurance policy was required by MCL 500.3006. Under the Insurance Code of 1956, MCL 500.100 *et seq.*, casualty insurance includes medical malpractice insurance. MCL 500.624(1)(h). Chapter 30 of the Insurance Code of 1956, MCL 500.3004 *et seq.*, governs contracts for casualty insurance. MCL 500.3004 provides:

> No policy of insurance against loss or damage resulting from accident to or injury suffered by an employee or other person and for which the person insured is liable, or against loss or damage to property caused by draft animals or by any vehicle drawn, propelled or operated by any motive power, and for which loss or damage the person insured is liable, shall be issued or delivered in this state by any insurer authorized to do business in this state, unless there shall be contained within such policy the provisions required under [MCL 500.3006 and MCL 500.3008].

MCL 500.3006 provides:

> *In such liability insurance policies there shall be a provision that the insolvency or bankruptcy of the person insured shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of such policy*, and stating that in case execution against the insured is returned unsatisfied in an action brought by the injured person, or his or her personal representative in case death results from the accident, because of such insolvency or bankruptcy, *then an action in the nature of a writ of garnishment may be maintained by the injured person, or his or her personal representative, against such insurer under the terms of the policy for the amount of the judgment in the said action not exceeding the amount of the policy.* [Emphasis added.]

The Supreme Court has cited MCL 500.3006 for the proposition that, even if an insured is insolvent or bankrupt, his insurer must defend the action and pay if a judgment is rendered against the insured. *Williams v Grossman*, 409 Mich 67, 85, 85 n 23; 293 NW2d 315 (1980).

Section IX.G of the insurance policy does not contain the language of MCL 500.3006. MCL 500.3012 states the effect of an insurance policy that does not include the language of MCL 500.3006. MCL 500.3012 states:

> Such a liability insurance policy issued in violation of [MCL 500.3004 to MCL 500.3012] shall, nevertheless, be held valid but be deemed to include the provisions required by such sections, and when any provision in such policy or rider is in conflict with the provisions required to be contained by such sections, the rights, duties and obligations of the insured, the policyholder and the injured person shall be governed by the provisions of such sections: Provided, however, That the insurer shall have all the defenses in any action brought under the provisions of such sections that it originally had against its insured under the

-41-

terms of the policy providing the policy is not in conflict with the provisions of such sections.

There is no claim that § IX.G of the insurance policy conflicts with the language of MCL 500.3006. Therefore, the language of MCL 500.3006 should be deemed to be included in the insurance policy and § IX.G should be read, according to its plain language, to determine whether it provides any further protection for the insured. We are not aware of any authority that would support replacing § IX.G with the language of MCL 500.3006 where there is no conflict between the two provisions. Accordingly, we look at the language of § IX.G, rather than MCL 500.3006, to analyze Langeland's argument. But, as already explained, § IX.G does not support the argument made by Langeland.

In sum, we hold that the amount of damages in a bad faith action against an insurer, where the insured files for bankruptcy, is an amount equal to the assets that are collected by the trustee of the bankruptcy estate. The trial court did not err in denying AP Capital's motions for summary disposition or its motion for directed verdict.

### III. TIBBLE'S RECOVERY FROM THE SYMONS ESTATE

Tibble argues that the trial court erred when it held that he was precluded from recovering any portion of the Symons judgment from AP Capital because Prodinger had been discharged from the judgment. He asserts that the trial court erred because (1) one of Prodinger's assets—the legal malpractice action against the Hackney defendants, which was settled for $350,000—was used to pay the Symons judgment and (2) based on *Keeley II*, which adopted Justice LEVIN's opinion in *Keeley I*, Prodinger's discharge did not preclude him from recovering a portion of the Symons judgment.[22] Tibble claims that, because Prodinger was solvent when the Symons Judgment was entered and suffered economic harm as a result of the judgment, Prodinger's discharge in bankruptcy did not preclude the bad faith claim. The argument is generally based on Justice LEVIN's opinion in *Keeley I*. In response, AP Capital argues that, based on Justice LEVIN's opinion in *Keeley I* and *McClarty*, Prodinger's discharge in bankruptcy, regardless whether Prodinger was solvent when the Symons Judgment was entered, barred Tibble from collecting any portion of the Symons Judgment. These arguments are duplicative of the arguments presented in Issue II, *supra*, in which we concluded that the damages in a bad faith action against an insurer, where the insured has filed for bankruptcy, should be an amount equal to the insured's assets that were collected by the trustee of the bankruptcy estate.

Given our conclusion in Issue II, the trial court properly prevented Tibble from recovering any portion of the Symons Judgment from AP Capital only if Tibble did not collect

---

[22] Although the trial court precluded Tibble from collecting any portion of the Symons Judgment from AP Capital, it allowed Tibble to collect the attorney fees that Prodinger incurred for appealing the Symons Judgment and filing for bankruptcy. AP Capital makes no argument that the trial court erred in allowing Tibble to recover Prodinger's attorney fees. In fact, AP Capital states that it was "arguably liable" for Prodinger's attorney fees.

any assets from Prodinger. If Tibble collected assets from Prodinger, then Tibble was entitled to recover an amount equal to those assets from AP Capital. Prodinger did not testify about any assets that were collected by Tibble after he filed for bankruptcy. Tibble testified that the largest asset of Prodinger's bankruptcy estate was the bad faith claim and that "there may be a few other things." However, Tibble acknowledged that the legal malpractice action was also an asset of Prodinger's bankruptcy estate and that the actions had been settled for $350,000. The legal malpractice action, which had a value of $350,000, was an asset of Prodinger that was collected by Tibble.[23]

AP Capital argues that the appropriate measure of damages in a bad faith action is the amount needed to make the insured whole by placing the insured in the same position that would have existed had there been no breach of the duty to settle and that this amount does not include the value of the cause of action for a party's conduct that resulted in entry of the excess judgment. AP Capital argues that, absent its bad faith, there would have been no opportunity for Hackney to commit malpractice during the Symons trial. According to AP Capital, but for its bad faith, Prodinger would not have had a legal malpractice claim against Hackney and his financial position could not have been increased by the proceeds of the settlement.

The basis for AP Capital's argument is a paragraph that Judge Keeton wrote in explaining why an insured's damages in a bad faith action should be limited to the insured's net assets not exempt from legal process. Justice LEVIN stated that, while he would "not so limit the injured person's recovery," he otherwise agreed with Judge Keeton's analysis. *Keeley I*, 433 Mich at 562 n 27. The pertinent paragraph by Judge Keeton reads:

> The appropriate measure of damages, when an insured is entitled to a recovery that is in excess of the applicable liability insurance policy limits, should be the amount needed to make the insured whole by placing the insured in the same position that would have existed had there been no breach of the duty to settle. Furthermore, *this sum should be established after taking into account the amount, if any, that the third party claimant could have realized upon rights against the insured if there had been no cause of action for liability in excess of policy limits*—that is, after taking into account how much could have been recovered above the insurance policy limits against an insured who had some assets, but not enough that the third party could recover more than could have been recovered against the insured. This might be done by permitting a single recovery against the insurer on the excess liability claim, at the instance of either the insured or the third party claimant, in an amount equal to the insured's net

---

[23] We find no merit to AP Capital's argument that the settlement proceeds did not "belong" to Prodinger's bankruptcy estate. There is no dispute that the legal malpractice claim was an asset that Prodinger surrendered to his bankruptcy estate. AP Capital admits that the $350,000 was paid to Tibble. Thus, the $350,000 became part of Prodinger's bankruptcy estate, and Tibble was required to give the settlement proceeds to the Symons Estate.

assets which are not exempt from legal process, and holding that the claimant's tort judgment against the insured is fully discharged by payment of this sum to the claimant either by the insured or by the insurer on the insured's behalf. Although in some instances this amount may be somewhat more than the net recovery the claimant would otherwise have realized (apart from the excess liability claim) this approach certainly more closely approximates that recovery and it provides full protection of the insured's financial position from the consequences of the insurer's wrong to the insured in failing to settle. [*Id*. at 562-563 n 27 (emphasis in original omitted, emphasis added).]

Judge Keeton suggested that the measure of damages in a bad faith action be limited to "an amount equal to the insured's net assets which are not exempt from legal process."[24] Judge Keeton reached this conclusion after stating that the measure of damages "should be the amount needed to make the insured whole by placing the insured in the same position that would have existed had there been no breach of the duty to settle" and that this "sum should be established after taking into account the amount, if any, that the third party claimant could have realized upon rights against the insured if there had been no cause of action for liability in excess of policy limits." Thus, Judge Keeton stated that the amount of the insured's damages is determined by looking at the amount that could be collected from the insured by the third-party claimant had the insurer not acted in bad faith. Accordingly, the bad faith cause of action is not to be considered in determining the amount of damages against the insured.

In addition, specific to this case, the value of the legal malpractice action should not be considered in determining the amount of damages for AP Capital's bad faith. AP Capital is correct that, but for its bad faith, the question of whether Hackney committed legal malpractice would not have arisen. If AP Capital had settled with the Symons Estate, no trial would have occurred, and there would have been no opportunity for Hackney to allegedly commit malpractice. Thus, Prodinger only had the asset of a legal malpractice action because AP Capital acted in bad faith. Because the legal malpractice action was a consequence of AP Capital's bad faith, payment to Prodinger of the value of the action, eventually determined to be $350,000, was not necessary to place him in the economic position that would have existed had there been no bad faith by AP Capital. In fact, payment of the value of the legal malpractice action to Prodinger would place Prodinger in a better economic position than would have existed. Because the legal malpractice action did not exist absent AP Capital's bad faith, a third-party claimant could not have collected the value of the action from Prodinger if AP Capital had not acted in bad faith.

---

[24] Justice LEVIN expanded the measure of damages to include assets that the insured could obtain in the future and from which the judgment could be collected. *Id*. at 565. Justice LEVIN's addition to the measure of damages is not applicable to Prodinger. Because Prodinger was discharged from the Symons Judgment, no assets that Prodinger obtains in the future can be used to satisfy the judgment.

A comparison of the legal malpractice action and the assets of BCEP that were collected by Langeland is helpful. Langeland testified that the assets he collected from BCEP had a value of $654,738. Nolin testified that BCEP turned over accounts receivable, a tax return, and a bank account to Langeland. The accounts receivable, the tax return, and the bank account were not owned by BCEP because of AP Capital's bad faith. Thus, absent AP Capital's bad faith, a third-party claimant could have collected the accounts receivable, the tax return, and the bank account from BCEP. Because these assets were owned by BCEP irrespective of AP Capital's bad faith, damages in an amount equal to their value would be necessary to place BCEP in the same position that would have existed had AP Capital not acted in bad faith.

Because Prodinger did not have the legal malpractice action absent AP Capital's bad faith, we affirm the trial court's holding that Tibble could not recover any portion of the Symons Judgment from AP Capital. This Court will affirm the trial court if it reached the right result albeit for the wrong reason. *Messenger*, 232 Mich App at 643.

## IV. MOTION FOR PARTIAL JNOV OR REMITTITUR

AP Capital argues that the trial court erred when it denied its motion or partial JNOV or, in the alternative, remittitur, because there was no legal justification for the portion of the jury verdict that represented the amount needed to pay off the Symons judgment, which was $687,313, because that amount, as a matter of law, was not an element of damages authorized by law in an action for bad faith against an insurer. AP Capital argued that, based on *Keeley II*, the amount of damages in a bad faith action equals the amount that the third-party claimant could recover from the insured (which was the amount of the insured's assets not exempt from legal process) and that this amount did not include the value of the bad faith action. AP Capital asserted that permitting Langeland to recover the amount to pay off the Symons judgment eliminated and eviscerated the rule of *Keeley II* because "permitting and treating the value of the bad faith cause of action to be deemed an 'asset of the insured' would make the insured collectible vis-à-vis the injured party and has, improperly made [BCEP] collectible to the extent of $687,313."

In response, Tibble and Prodinger argued that *Keeley I* made clear that whether the judgment rule, prepayment rule, or the compromise rule of Justice LEVIN applied, the damages in a bad faith action must be sufficient to make the insured whole and to place the insured in the same economic position he would have been in had the contract been performed. They asserted that the remedy proposed by AP Capital would turn *Keeley II* on its heads by ensuring that BCEP did not recover one penny of its lost accounts receivable. They claimed that AP Capital's argument was valid only if bankruptcy law allowed Langeland, after giving the assets of BCEP to the Symons Estate in partial satisfaction of the Symons judgment, to give the damages obtained in the bad faith to BCEP. Tibble and Prodinger further argued that nothing in Justice LEVIN's opinion in *Keeley I* supported the assertion that the amount of damages to be recovered from AP Capital did not include the value of the asset of the bad faith action. They stated that Justice LEVIN never carved out an exception for the value of the bad faith action and that, because the damages collected from AP Capital for its bad faith would be confiscated by Langeland, the entire unpaid amount of the Symons Judgment must be collected so that Langeland could return BCEP to its previous position.

In reply, AP Capital argued that if Langeland, but not Tibble, was permitted to recover the amount necessary to pay off the Symons judgment because corporate debtors, unlike individual debtors, do not receive discharges of debt in bankruptcy, then it was denied equal protection of the law. According to AP Capital, there cannot be one rule for individual insureds and a different rule for corporate insureds.

The trial court denied AP Capital's motion. It explained:

Under the bankruptcy law on a bad faith claim the bankrupt brt [sic] insured is entitled to be made whole as a result of the bad faith by the medical malpractice carrier in this case.

The corporate bankrupt surrendered $654,000 in value of accounts receivable. Under [AP Capital's] argument the bankruptcy law then discharges the Simons [sic] obligation, the value of the accounts receivable is turned over to the Simons [sic]. It is the effect of the discharge that limits the exposure of the carrier in order to make the bankrupt debtor whole, to put the corporation back into the position it had been at the time of the surrender just prior to the surrender of assets, however many there were.

The liability to the Simons [sic] still exists. And it may well be that this conclusion that I have reached is contrary to the idea that it is only the hard assets that can be utilized to pay the Simons [sic]. But [Langeland] has argued I need to declare the bankruptcy law constitutional (sic) and I will not do so. That's not in my view within my prerogative in this case.

If, on the other hand, A. P. Capital pays to Mr. Langeland 1.9 million dollars, the bankruptcy judge could well decide that 1.3 million dollars in round figures will be returned to A. P. Capital because the debt to the Simons has been satisfied solely by the value of the accounts receivable and damage returned, whatever else may be there. I will not decide the effect of the discharge, the requirement for additional funds given the fact that a corporation does not vanish. I will leave that in the hands of the bankruptcy judge and I will not go any further.

In Support of their arguments on appeal, AP Capital, as well as Tibble and Langeland, discuss *Keeley I* and *Keeley II* and what amount, pursuant to these two cases, can be recovered against AP Capital for its bad faith. We need not reanalyze *Keeley I* and *Keeley II*. Rather, we stand by our two previous conclusions: (1) the damages in a bad faith action against an insurer, where an insured has filed for bankruptcy, is an amount equal to the insured's assets that were collected by the trustee, and (2) the damages do not include the value of the bad faith action against the insurer.

We conclude that the trial court should have granted AP Capital's motion or partial JNOV or, in the alternative, for remittitur. A motion for JNOV should be granted when the evidence, viewed in the light most favorable to the nonmoving party, fails to establish a claim as a matter of law. *Prime Fin Servs LLC v Vinton*, 279 Mich App 245, 256; 761 NW2d 694 (2008). A partial JNOV may be granted to vacate discrete elements of a verdict that are wholly lacking

-46-

in evidentiary support. See *Attard v Citizens Ins Co of America*, 237 Mich App 311, 322-327; 602 NW2d 633 (1999). Remittitur is justified when the jury verdict is "excessive." MCR 2.611(E)(1). A verdict is excessive when the amount awarded is greater than the highest amount the evidence will support. *Palenkas v Beaumont Hosp*, 432 Mich 527, 531-532; 443 NW2d 354 (1989). In light of our conclusion in Issue II, Langeland was permitted to collect damages from AP Capital in the amount equal to the assets that he collected from BCEP. Langeland testified that he confiscated $654,738 in assets. Thus, damages awarded by the jury above the amount of $810,410 (which is the sum of $654,738, the amount of the confiscated assets, and $155,672, the amount of BCEP's attorney fees) were wholly unsupported by the evidence.

Consequently, the verdict in favor of Langeland must be reduced by $687,313. A reduction in the verdict of $1,497,732 by $687,313 results in damages in the amount of $810,410. Accordingly, we grant remittitur and instruct the trial court to reduce the jury's verdict in favor of Langeland by $687,313.

## V. LANGELAND'S POST-JUDGMENT REQUEST FOR SETOFF

On cross-appeal, Langeland argues that the trial court erred by granting AP Capital's request for a setoff in the amount of the legal malpractice settlement, thereby reducing the damages awarded by the jury to Langeland by $350,000. A trial court's decision whether to grant a setoff, which is an equitable remedy, is reviewed de novo. *Grace v Grace*, 253 Mich App 357, 468; 655 NW2d 595 (2002).

Following trial, AP Capital objected to Langeland and Timmon's proposed judgment, claiming that the judgment should include a setoff for the proceeds from the legal malpractice settlement. AP Capital argued that a setoff was necessary to prevent a double recovery because the $350,000 received from the legal malpractice settlement had been added to the funds available to satisfy the Symons judgment. The trial court granted AP Capital's motion for a setoff, explaining in part:

> [T]he point of it is on the first day of trial in Langeland and Tibble versus American Physicians Capital, Hackney got settled out. He paid $350,000. Now, I'm not about to get into nickels and dimes. The settlement was 350 and that's the setoff.
>
> The reason setoff is being granted is A.P. Capital is entitled to the credit of whatever has been used against the Simons [sic] verdict, together with the accrued interest and costs, in paying the net amount, whatever that net amount is clearly almost a million dollars in excess of what their exposure was. They already paid the $350,000 plus accrued interest and so on. So that comes off the verdict.
>
> The accounts receivable from BCEP comes off the verdict.
>
> The $350,000 that Hackney paid which related exclusively to his failure to ask for a setoff for the social security benefits which he should have done, and the Supreme Court in its order said it was wrong not to seek that. His payment for his failure to see the setoff is exclusively economic.

And Prodinger has said it didn't bother me that he didn't do that. So A.P. Capital is entitled to that setoff. And it is the net amount to be paid by A.P. Capital.

The court reiterated that the $350,000 would be set off against Langeland's judgment.

Langeland argues that the trial court erred when it reduced the damages awarded to him for AP Capital's bad faith by the amount of the legal malpractice settlement because (1) AP Capital, in requesting postjudgment relief in the form of a setoff, took a position contrary to what it had taken at trial; (2) there was no double recovery because the settlement did not duplicate the economic damages awarded by the jury; (3) the tort reforms of 1995 abolished setoffs; and (4) there is no case law to support the proposition that the damages awarded to Langeland can be set off with the proceeds from the settlement when he received nothing from the settlement.

Langeland first argues that AP Capital was precluded from requesting a setoff in the amount of the legal malpractice settlement after judgment was entered because it never objected to letting the jury decide whether the amount of the Hackney settlement proceeds should be subtracted from any verdicts in favor of him and Tibble. The rule of law relied on by Langeland is well known. "A party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since to do so would permit the party to harbor error as an appellate parachute." *Dresselhouse v Chrysler Corp*, 177 Mich App 470, 477; 442 NW2d 705 (1989). See also *Lewis v Legrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003) ("It is settled that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence.").

During trial, Tibble presented the trial court with the following proposed jury instruction regarding the legal malpractice settlement:

You heard during this trial that the Plaintiffs have settled with Attorney Randy Hackney for $350,000. If you find in favor of the Plaintiffs against the Defendant AP Capital, you are not to deduct all or any portion of the $350,000 from your award to the Plaintiffs. Following your verdict, I will determine whether any portion of the $350,000 settlement should be deducted from your verdict.

Before the jury was instructed, there was no discussion on the record regarding this "special jury instruction #3."

Also, during trial, AP Capital submitted a supplemental trial brief in which it explained that sufficient funds would be available to apply to the Symons judgment. AP Capital provided the trial court with a proposed verdict form. The verdict form asked the following five questions: (1) Did AP Capital act in bad faith in failing to negotiate a settlement with the Symons Estate? (2) Was Prodinger or BCEP damaged by AP Capital's bad faith? (3) What is the amount of attorney fees that BCEP was required to pay for appealing the Symons Judgment, negotiating a settlement, and filing for bankruptcy? (4) What was the net value of the assets that BCEP turned over to Langeland? and (5) What was the net value of the assets that Prodinger turned over to Tibble?

Langeland disputed AP Capital's assertion that the $350,000 from the Hackney settlement should be subtracted from the damages payable to him. He argued that the assertion "ignores the obvious fact that the reason BCEP did not share in that settlement . . . because those damages were paid for Dr. Prodinger's emotional distress damages and his bankruptcy attorney fees, both of which were recoverable only from Mr. Hackney." In addition, Langeland argued that Prodinger lost the $350,000 from the settlement as a result of AP Capital's bad faith and, therefore, the amount of damages collectable from AP Capital should include the $350,000.

In reply, AP Capital denounced the suggestion that the $350,000 settlement proceeds should be considered an asset surrendered to the bankruptcy estates. It wrote:

> Defendant APCapital contends that this should not be allowed because there is no basis in the evidence presented for any finding that the payment of this money was necessitated by any bad-faith conduct on APCapital's part. This money was instead paid to settle Plaintiffs' claim that the *Symons* Judgment was larger than it should have been because of Mr. Hackney's malpractice. Without that malpractice, the judgment against Dr. Prodinger and BCEP would have been smaller, and thus, they would not have had any claim for the excess amount attributable to the malpractice as an element of damages for APCapital's bad faith. . . . [T]hat payment has no relevance to the determination of what Dr. Prodinger and BCEP have lost by virtue [of] their bankruptcy filings as a result of any bad faith conduct on the part of APCapital.

In addition, AP Capital asserted that, if the jury was allowed to include the settlement proceeds as an asset lost to the bankruptcy estates, it should be granted a $350,000 setoff against any damages awarded.

The trial court held that Langeland could recover from AP Capital the unpaid amount of the Symons judgment and an amount necessary to place BCEP in the position it was before AP Capital's bad faith and that Tibble, because Prodinger had been discharged from the Symons Judgment, could not collect on the judgment, although he could recover the amounts that Prodinger had spent in attorney fees as a result of AP Capital's bad faith. Also in its decision, the trial court stated that the jury would be allowed to consider setoffs, including the legal malpractice settlement.

In their closing arguments, neither Tibble nor Langeland addressed the legal malpractice settlement. In its closing argument, AP Capital requested the jury, in determining how much Langeland needed to pay off the Symons judgment, to reduce the amount of the Symons judgment by $350,000. It stated, "Well, we know Mr. Hackney settled his case for $350,000. And that's going to be applied to the judgment. So you have to reduce the [$]696,000[25] by

---

[25] The amount of $696,000 is the total of the Symons judgment ($1.3 million) minus the maximum Social Security setoff that Hackney failed to request ($402,317) minus the amount that AP Capital paid on the Symons judgment ($371,000) plus accruing interest ($163,000).

$350,000." In rebuttal arguments, Langeland and Tibble addressed the $350,000 settlement proceeds. Langeland stated:

> There's still a judgment that's owed to Mrs. Symons for 1.206 million dollars. Now if there's bad faith in this case, BCEP, its shareholders who still own that corporation are entitled to get their money back. . . .

> \* \* \*

> Now did he [Langeland] sue Mr. Hackney. [sic] Yes, he did. Did he get a verdict against Mr. Hackney. [sic] Yes, he did. They've already asked Judge Kingsley to reduce whatever you award in this case by $350,000. Now he's trying to get double dip on the reduction. He's asking you to reduce your verdict by the 350, then he's going to ask Judge Kingsley to do it again.

AP Capital objected to Langeland's statement. The trial court sustained the objection and the remark was stricken from the record. Tibble argued:

> It's true that Dr. Prodinger settled with Mr. Hackney for $350,000. The reason is they're not responsible -- sometimes the law is silly. They're not responsible for all the emotional distress he went through by filing bankruptcy, humiliation, the being out of work for two years, every thing that poor man went through they have to pay for, but Mr. Hackney does. For his malpractice he's responsible for the emotional distress. That $350,000 should not go to pay this judgment. It belongs to Dr. Prodinger for all he's been put through.

> And if you decide that A.P. Capital should be the one paying that judgment, as I think they should, then that Dr. Prodinger should get that $350,000. If you decide otherwise, then he doesn't get it. It goes to pay the judgment, but that's the issue that's up to you. . . .

The trial court's instructions to the jury did not mention anything about setoffs. When it finished instructing the jury, the trial court asked the parties if they had any objections to the instructions that had not previously been noted. Tibble responded, "I do object to the fact you didn't give the instruction on the fact that the $350,000 setoff -- $350,000 settlement with Mr. Hackney would be setoff later by the court which I believe [is] the appropriate way to do this and which was, in fact, requested earlier in trial by [the attorney for Langeland]. The trial court overruled the objection "for the reason that each side had the ability to argue and did so argue how you determine the net value of the verdict to the Symons family." AP Capital did not have any objections to the instructions.

We reject Langeland's argument that AP Capital took a position contrary to what it had taken during trial when it asked the trial court for postjudgment relief in the form of a setoff for $350,000. First, as previously stated, there was no discussion on the record regarding "special jury instruction #3." Because there was no discussion on the record regarding this instruction, it is simply unknown what arguments AP Capital made concerning the instruction. Second, an issue raised by AP Capital's supplemental trial brief and Langeland's response to it was whether the legal malpractice settlement proceeds could be considered part of the assets that were lost by

-50-

Prodinger or BCEP when they filed for bankruptcy. AP Capital asserted that, if the jury was allowed to include the $350,000 settlement proceeds in the assets that were lost to the bankruptcy estates, it was then entitled to a setoff in that amount. However, AP Capital made no suggestion regarding who, the trial court or the jury, should determine whether it was entitled to a setoff. In determining what damages Tibble and Langeland could collect from AP Capital for its bad faith, the trial court changed its previous ruling on the issue. It held that Langeland's damages included the unpaid amount of the Symons Judgment and the amount necessary to place BCEP in the position it was in before AP Capital's bad faith. The trial court stated that the jury, in determining the amount of damages to award Langeland, could consider setoffs, including the proceeds of the Hackney settlement. However, before the trial court held that the jury could consider setoffs, there had been no argument before the trial court regarding whether it or the jury should decide whether AP Capital was entitled to a setoff for the proceeds from the Hackney settlement.

The basis for Langeland's argument that AP Capital was precluded from asking for postjudgment relief in the form of a setoff was that AP Capital had wanted the jury, rather than the trial court, to determine whether it was entitled to a setoff for the settlement proceeds. However, as just explained, AP Capital never took a position, on the record, regarding whether the jury or the trial court should make this determination. It was the trial court, without any argument from the parties, who held the jury could consider setoffs in awarding damages for AP Capital's bad faith. Accordingly, we cannot conclude that AP Capital, in moving for postjudgment relief, assigned as error a decision which its counsel deemed proper at trial. *Dresselhouse*, 177 Mich App at 477.

Langeland next argues that AP Capital is not entitled to a setoff for the proceeds of the legal malpractice settlement because setoffs were abolished with the 1995 tort reforms.

MCL 600.2925d, before it was amended by 1995 PA 161, stated:

> When a release or a covenant not to sue or not to enforce a judgment is given in good faith to 1 or 2 or more persons liable in tort for the same injury or the same wrongful death:
>
> (a) It does not discharge any of the other tort-feasors from liability for the injury or wrongful death unless its terms so provide.
>
> (b) It reduces the claim against the other tort-feasors to the extent of any amount stipulated by the release or the covenant or to the extent of the amount of the consideration paid for it, whichever amount is the greater.
>
> (c) It discharges the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor.

MCL 600.2925d(b) codified the common-law setoff rule. *Velez v Tuma*, 492 Mich 1, 11; 821 NW2d 432 (2012); *Markley v Oak Health Care Investors of Coldwater, Inc*, 255 Mich App 245, 255; 660 NW2d 344 (2003). However, the subsection was deleted from MCL 600.2925d by the 1995 tort reform legislation "because the tort reform legislation, for the most part, abolished joint

and several liability in favor of allocation of fault or several liability." *Markley*, 255 Mich App at 255, citing MCL 600.2956 and MCL 600.6304.

MCL 600.2956 provides:

> Except as provided in [MCL 600.6304], *in an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death*, the liability of each defendant for damages is several only and is not joint.  However, this section does not abolish an employer's vicarious liability for an act or omission of the employer's employee.  [Emphasis added.]

MCL 600.6304 provides,

> (1) *In an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death* involving fault of more than 1 person, including third-party defendants and nonparties, the court, unless otherwise agreed by all parties to the action, shall instruct the jury to answer special interrogatories or, if there is no jury, shall make findings indicating both of the following:

> (a) The total amount of each plaintiff's damages.

> (b) The percentage of the total fault of all persons that contributed to the death or injury, including each plaintiff and each person released from liability under [MCL 600.2925d], regardless of whether the person was or could have been named as a party to the action.

> (2) In determining the percentages of fault under subsection (1)(b), the trier of fact shall consider both the nature of the conduct of each person at fault and the extent of the causal relation between the conduct and the damages claimed.

> (3) The court shall determine the award of damages to each plaintiff in accordance with the findings under subsection (1), subject to any reduction under subsection (5) or [MCL 600.2955a or MCL 600.6303], and shall enter judgment against each party, including a third-party defendant, except that judgment shall not be entered against a person who has been released from liability as provided in [MCL 600.2925d].

> (4) Liability in an action to which this section applies is several only and not joint.  Except as otherwise provided in subsection (6), a person shall not be required to pay damages in an amount greater than his or her percentage of fault as found under subsection (1). This subsection and [MCL 600.2956] do not apply to a defendant that is jointly and severally liable under [MCL 600.6312].

* * *

-52-

(8) As used in this section, "fault" includes an act, an omission, conduct, including intentional conduct, a breach of warranty, or a breach of a legal duty, or any conduct that could give rise to the imposition of strict liability, that is a proximate cause of damage sustained by a party. [Emphasis added.]

The goal of statutory interpretation is to ascertain and effect to the intent of the Legislature. *Scholma v Ottawa Co Rd Comm*, 303 Mich App 12, 19; 840 NW2d 186 (2013). If the statutory language is unambiguous, the Legislature is presumed to have intended the meaning clearly expressed, and the statute must be enforced as written. *Id*. "[A] court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 63; 642 NW2d 663 (2002).

In *Laurel Woods Apartments v Roumayah*, 274 Mich App 631; 734 NW2d 217 (2007), the defendants, Najah Roumayah and Rebecca Roumayah, signed a lease agreement for an apartment that listed them "jointly severally" as the "tenant." The lease agreement made the "tenant" liable for any damage to the apartment. A fire caused by Rebecca resulted in substantial damage to the apartment. The plaintiff sued Najah and Rebecca, claiming that they were jointly and severally obligated to pay for the damage. Najah argued that the claim against him should be dismissed because there was no evidence that he caused the fire and, pursuant to MCL 600.2956, he could not be held jointly and severally liable for the damage. This Court rejected the argument. *Id*. at 641-642. It stated:

> [T]his case does not sound in tort. It is strictly a breach of contract claim, and the contract provides:
>
> > THIS APARTMENT LEASE AGREEMENT ("Lease") is made and entered into this date of June 1, 2005 between LAUREL WOODS APARTMENTS L.L.C[.]; with an address of 22200 Laurel Woods Drive, Southfield, Michigan 48034 ("Landlord") (jointly severally) Najah Roumayah & Rebecca Roumayah ("Tenant").
>
> It is undisputed that Najah and Rebecca Roumayah signed the lease agreement. Thus, according to its plain terms, the parties agreed that Najah and Rebecca Roumayah were jointly and severally liable.
>
> By its plain terms, MCL 600.2956 does not preclude this agreement; it applies to tort actions "or another legal theory seeking damages for personal injury, property damage, or wrongful death." While this breach of contract claim clearly seeks to recover for damage to plaintiff's property, the damages sought are pursuant to contract and therefore are contract damages that arise incidentally from property damage. MCL 600.2956 does not provide that it applies to a legal theory seeking contract damages. Nor is there any indication that the Legislature, by amending MCL 600.2956, sought to limit or eliminate the parties' freedom to contract. The parties agreed that defendants would be jointly and severally liable

for any damage that either of them caused. This agreement is not precluded by MCL 600.2956. [*Id*. at 642.]

In *Zahn v Kroger Co of Michigan*, 483 Mich 34; 764 NW2d 207 (2009), Brian Zahn, an employee of Cimarron, a subcontractor, was injured when he fell from scaffolding during the renovation of a Kroger store. Zahn sued the Kroger Company and the general contractor, Martin Construction Company, for negligence. Martin Construction Company settled with Zahn and resolved indemnification claims with the Kroger Company. It then requested enforcement of the terms of an indemnification clause in its agreement with Cimarron. The indemnification clause stated that Cimarron shall indemnify Martin Construction Company for all claims of bodily injury or property damage that arise from the performance of its work. The trial court, after finding that Cimarron was 80 percent negligent and Martin Construction Company was 20 percent negligent, held that Cimarron was required to reimburse Martin Construction Company for 80 percent of the settlement amounts. On appeal, Cimarron argued that, because MCL 600.2956 abolished joint and several liability, the indemnification clause was unenforceable. The Supreme Court disagreed. *Id*. at 39. It stated that "[t]o adopt the position that MCL 600.2956 renders express contractual indemnification clauses unenforceable would require that we negate the parties' contract. We find no language in the statute, nor any compelling public policy, that would require us to do so." *Id*. It also stated:

> The Court of Appeals addressed the identical legal challenge in reviewing a substantially similar express indemnification clause governing a construction site accident. See *Essell v George W Auch Co* [, unpublished opinion per curiam of the Court of Appeals, issued February 24, 2004 (Docket No. 240940)]. That Court noted, "Although novel, the argument is also contrived because it selectively implicates the underlying negligence complaint and ignores the substance of the cross-complaint, an action based in contract." The Court opined:
>
> > However, defendants ignores [sic] the first sentence of MCL 600.2956, that limits its application to "an action based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death . . . [.]" While the underlying complaint by Essel [sic] is a tort action seeking damages for personal injury, the action at issue in this cross-complaint is an action based on contract theory. Plaintiff's lawsuit seeks reimbursement for monies paid, not for its own personal injury, property damage, or wrongful death. There is no indication that the Legislature, by amending MCL 600.2956, sought to limit or eliminate the parties' freedom of contract to allocate damages should a breach of contractual duty occur. Indeed, MCL 600.2956 contains the proviso that it applies to tort actions or actions where the legal theory results in damages for personal injury, property damage, or wrongful death. *ISB* [*Sales, Co v Dave's Cakes*, 238 Mich App 520, 529-530; 672 NW2d 181 (2003)]. If the Legislature had intended to include all other actions, including contract actions, it expressly would have done so and would not have placed any restricting language within the statute. [*Id*. at 5.]

We find the above analysis persuasive and hold that MCL 600.2956 does not apply to contract actions, and the language chosen by the parties as contained in the contract is controlling. [*Id*. at 13.]

Here, the present action was a claim by Langeland and Tibble that AP Capital acted in bad faith when it failed to settle with the Symons Estate. A claim against an insurer for bad faith is a breach of contract claim. See *Keeley I*, 433 Mich at 556-557 (opinion by LEVIN, J.) ("Until now, the rule in Michigan has been that the action for bad-faith failure to settle sounds in contract and not in tort."); *Kewin*, 409 Mich at 422-423 (stating that a tort action will not lie for an insurer's bad faith breach of an insurance contract).[26] Because the claim against AP Capital is a contract claim, we conclude that MCL 600.2965 does not apply to the bad faith claim asserted against AP Capital. Admittedly, the facts of the present case are significantly different from the facts of either *Zahn* or *Laurel Woods Apartments*. The present case does not involve a contract clause that sets forth the liability of the contracting parties. However, the Supreme Court in *Zahn* and this Court in *Laurel Woods Apartments* looked at the "proviso" of MCL 600.2956— "in an action based on tort or another legal theory seeking damages for personal injury, property damages, or wrongful death"—and held that the statute does not apply to contract actions, *Zahn*, 483 Mich at 37, 40, or to legal theories seeking contract damages, *Laurel Woods Apartments*, 274 Mich App at 642. Because Langeland and Tibble were seeking damages from AP Capital for its breach of the insurance policy, the claim against AP Capital falls outside the purview of MCL 600.2965. See *Scholma*, 303 Mich App at 19 (stating that unambiguous statutory language must be enforced as written). Accordingly, MCL 600.2965 does not preclude AP Capital's request for a setoff in the amount of the proceeds from the legal malpractice settlement.

The two remaining issues raised by Langeland are whether the settlement proceeds constituted a double recovery and whether the damages awarded to him can be set off by the settlement proceeds when the proceeds were received by Tibble. These arguments, however, were made in the context of the jury having awarded $1,497,723 in damages to Langeland. We have concluded that Langeland was only entitled to damages in the amount of $810,410, the sum of the value of the assets BCEP surrendered when it filed for bankruptcy and the amount of its attorney fees in appealing the Symons judgment and filing for bankruptcy. Additionally, we have concluded that, because the legal malpractice action resulted from AP Capital's bad faith, the proceeds of the legal malpractice settlement are not an asset of Prodinger's bankruptcy estate for which Tibble can recover. The parties have not addressed whether a setoff for the proceeds of the settlement is necessary if Langeland's recovery is limited to the value of the assets that BCEP turned over to the bankruptcy estate and BCEP's attorney fees and the settlement proceeds are not considered an asset of the bankruptcy estate for which recovery is available. We therefore vacate that portion of the judgment that awarded a setoff to Langeland in the amount of

---

[26] We note that Langeland, in his brief on cross-appeal, states that his claim against AP Capital for bad faith was a claim for breach of warranty. However, in his reply brief, Langeland acknowledges that a claim for bad faith is a breach of contract claim.

$350,000 and remand to the trial court for reconsideration of the setoff issue in light of this Court's conclusions.[27]

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.

/s/ Kurtis T. Wilder
/s/ E. Thomas Fitzgerald
/s/ Jane E. Markey

---

[27] On remand, if the trial court determines that a setoff for the legal malpractice settlement cannot be applied to the damages awarded to Langeland, Tibble may raise his argument presented on appeal that a setoff should be applied to the damages awarded to Tibble in order to avoid a double recovery by Tibble of the attorney fees that Prodinger incurred in filing for bankruptcy. Additionally, the trial court shall consider the effect of *Greer v Advantage Health*, ___ Mich App ___; ___ NW2d ___ (2014), which both parties have submitted to this Court as supplemental authority regarding the setoff issue.